THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
BYRON LINCOLN, Defendant-Appellant.

First District (1st Division)   No. 85—1926

Opinion filed June 22, 1987.

Steven Clark and Debra R. Salinger, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Thomas V. Gainer, Jr., Paula Carstensen, and Mark F. Smolens, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE QUINLAN delivered the opinion of the court:

Defendant Lincoln, along with codefendants Elston, Johnson, and Watson, were jointly indicted on charges of murder, attempted murder, aggravated battery, armed robbery, residential burglary, and home invasion in connection with an incident occurring March 3, 1984, at 1741 East 71st Street. (Ill. Rev. Stat. 1983, ch. 38, pars. 8—4, 9—1(a), 12—4(b)(1), 12—11(a)(2), 18—2, 19—3.) Prior to trial, all defendants moved for severance and Watson, the only defendant who did not give a post-arrest statement to police, was granted a severance while Lincoln's, Elston's, and Johnson's motions for severance were denied. At the close of the People's evidence, the trial court granted defendants' motions for directed findings as to the charges of armed robbery, residential burglary, and home invasion. The jury then found the defendants guilty of home invasion, aggravated battery, and attempted murders of Donald Mitchell and Pamela Eskridge, and of the murder of Tony Carter. Judgment was entered on all findings, but

later vacated as to the aggravated battery and home invasion counts. After a sentencing hearing, defendant Lincoln received a term of 30 years' incarceration for murder and two concurrent 10-year terms for attempted murder.

Donald Mitchell, his girl friend, Theresa Haggins, and her three children, and Pamela Eskridge lived in apartment 102 at 1741 East 71st Street in Chicago. On the morning of March 3, 1984, Mitchell, Haggins, and the children were in the bedroom of the apartment and Pamela Eskridge was in the living room with the decedent, Tony Carter. The defendant, Byron Lincoln, his girl friend, Yolanda Elston, and their two children lived next door in apartment 103. At about 8 a.m. on March 3, defendant Lincoln knocked on the door of apartment 102 and requested to speak with Mitchell. Eskridge let defendant Lincoln in and then walked through the kitchen to the back bedroom. Lincoln followed Eskridge, pushed the bedroom door open, and began shouting at Mitchell about "messing" with his girl friend and stealing his daughter's earrings. During this time, Eskridge walked back into the living room and observed codefendant Elston standing in front of the stereo which he had recently sold to Mitchell. Tony Carter was sitting on the couch and codefendant Johnson was standing in the doorway.

Eskridge returned to the bedroom and saw Watson, who was standing next to Lincoln, pull a .410 shotgun from beneath his coat and point the barrel at Mitchell. Lincoln allegedly told Watson to shoot Mitchell in the head. Mitchell and Eskridge were able to push the defendants out of the bedroom and hold the door shut. Watson fired two shots through the door, one hitting a dresser and the other striking Eskridge in the hand and Mitchell below the eye. At this time, Mitchell heard a voice coming from the back porch say, "I just bumped the guy in the front." Defendants Lincoln and Watson then burst through the bedroom door. Watson threw Lincoln the shotgun and then ran down the back stairs. Mitchell and Lincoln struggled over the shotgun; the barrel came apart from the handle and Lincoln also ran down the back stairs.

Mitchell, Eskridge and Haggins ran out the front door of the apartment and called the police from a neighbor's house. On their way through the living room, they observed Tony Carter lying on the floor with a shotgun wound in the stomach. When they returned to the apartment, they noticed that the stereo equipment was missing. Mitchell and Eskridge were later treated and released for their wounds. Tony Carter died from his wound.

Police recovered the stereo equipment that same day from Lin-

coln's apartment. Eskridge later identified Elston at the police station as being one of the men involved, and Elston then admitted holding a shotgun on Carter when it went off. Elston also permitted the police to search his car at the time of his arrest and an expended shotgun shell was recovered in the auto. Codefendant Johnson, in a post-arrest statement, told police that he, Elston, Lincoln and Watson had discussed going over to Mitchell's house to "take care of him" at a party that the codefendants attended the night before the incident. Johnson and Elston showed the police where the guns used in the incident were located. Lincoln also gave a post-arrest statement which corroborated Johnson's statement concerning their first meeting at the party and also told of a second meeting at Lincoln's apartment where the four men again discussed "taking care of" Mitchell before arming themselves and then going next door to Mitchell's apartment.

After their oral statements to the detectives, each of the defendants gave a statement to an assistant State's Attorney that was transcribed by a court reporter. The unredacted oral statements were given to the jury through the testimony of a police detective and later, the redacted versions were published to the jury with the limiting instructions that each statement could only be considered as a factor in determining the guilt of the defendant who made that statement. All of the defendants denied the truth of parts or all of their statements. The defendants renewed their motions for severance at the time the oral statements were admitted into evidence in their unredacted form. None of the defendants took the stand and the jury was instructed not to take into account the fact that a defendant did not testify. Instructions were also given on battery, aggravated battery, home invasion, recklessness, involuntary manslaughter, murder, and attempted murder. Judgment was entered on the jury findings that defendant Lincoln was accountable for the murder of Tony Carter and for the attempted murders of Pamela Eskridge and Donald Mitchell. Defendant's motion for a new trial was denied and Lincoln, as stated previously, was sentenced to a term of 30 years for murder and two concurrent 10-year terms each for the attempted murder convictions.

Defendant Lincoln appeals his conviction and sentence on the grounds that the trial court erred in denying his motions for severance, that the People failed to prove beyond a reasonable doubt that defendant agreed to, aided or abetted in the murder of Tony Carter, that reversible error occurred when the jury was not instructed that attempted murder requires a specific intent to kill, and finally, that the 30-year sentence for murder is excessive.

██ Taking defendant's first argument that severance was required here, we note that the general rule in criminal procedure has been that jointly indicted defendants are tried together before the same jury. (*People v. Lindsay* (1952), 412 Ill. 472, 480, 107 N.E.2d 614, 618.) However, as established in *Bruton v. United States* (1968), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620, the State may not use a codefendant's extrajudicial statements to inculpate the defendant in a joint trial because to do so would violate a defendant's sixth amendment right of confrontation. Where each defendant has made a statement which exculpates himself and inculpates his codefendant, the sixth amendment right of confrontation is abridged because a defendant cannot compel his codefendant to testify and is, thereby, denied his right to cross-examine the incriminating statements. However, this so-called *"Bruton"* problem may be resolved by granting a severance before trial or by redacting the codefendant's statements which are published to the jury to omit any reference to the defendant. (*Richardson v. Marsh* (1987), 481 U.S. ___, ___, 95 L. Ed. 2d 176, 188, 107 S. Ct. 1702, 1709.) In this case, although the written statements were redacted to remove any incriminating references to codefendants, the unredacted oral statements were admitted into the joint trial through the testimony of a detective so that the *Bruton* problem remained unresolved. Nevertheless, the trial judge here denied severance on the ground that the statements were properly admissible because they interlocked and were permitted in such circumstances under *Parker v. Randolph* (1979), 442 U.S. 62, 60 L. Ed. 2d 713, 99 S. Ct. 2132. However the *Parker* decision was overruled by *Cruz v. New York* (1987), 481 U.S. ___, 95 L. Ed. 2d 162, 107 S. Ct. 1714, during the pendency of this appeal.

██ Thus, the exception to *Bruton* carved out in *Parker v. Randolph*, which held that the extrajudicial statements of codefendants were admissible with proper limiting instructions where "the defendant himself has confessed and his confession 'interlocks' with and supports the confession of his codefendant" (*Parker v. Randolph* (1979), 442 U.S. 62, 64, 60 L. Ed. 2d 713, 718, 99 S. Ct. 2132, 2135) was rejected by the *Cruz* court. (*Cruz v. New York* (1987), 481 U.S. ___, 95 L. Ed. 2d 162, 107 S. Ct. 1714.) Previously, this court had held that where, as here, the statements interlocked as to material facts, admission did not result in unfair prejudice so as to require severance. (*People v. Sanford* (1983), 116 Ill. App. 3d 834, 452 N.E.2d 710.) However, in *Cruz*, Justice Scalia noted that it was the particularly devastating practical effect of a codefendant's statement, where the defendant denies his own statement which interlocks with his co-

defendant's statement, that rendered the interlocking confession constitutionally inadmissible. The court stated:

"A codefendant's confession will be relatively harmless if the incriminating story it tells is different from that which the defendant himself is alleged to have told, but enormously damaging if it confirms, in all essential respects, the defendant's alleged confession. It might be otherwise if the defendant were *standing by* his confession, in which case it could be said that the codefendant's confession does no more than support the defendant's very own case. But in the real world of criminal litigation, the defendant is seeking to *avoid* his confession—on the ground that it was not actually reported, or that it was not really true when made." (Emphasis in original.) (*Cruz v. New York* (1987), 481 U.S. \_\_\_\_, \_\_\_\_, 95 L. Ed. 2d 162, 171, 107 S. Ct. 1714, 1718.)

Severance, therefore, is now mandated whenever a codefendant's statement interlocks with the defendant's statement, which he denies the truth of at trial, because the admission of the codefendant's corroborating statement is so devastating to the defendant's defense as to deny him a fair trial.

Here, both codefendants made statements which pinpointed Lincoln as the person who was fed up with Donald Mitchell and wanted to "take care of him." Henry Johnson, Jr.'s, statement to police corroborated Lincoln's concerning the two separate discussions of a plan to take care of Mitchell, the assembling and arming of the codefendants at Lincoln's house, and the trip next door to Donald Mitchell's on the morning of March 3, 1984. Although codefendant Elston denied the existence of any plan to take care of Mitchell in his oral statement to police, he did state that Lincoln was in Mitchell's apartment during the incident and that Lincoln later ran to and jumped into Elston's car as he pulled away from the building after the shootings. The statements of Lincoln's codefendants were facially incriminating toward him and prejudicially corroborated his own statement, which he denied was truthful at trial. Moreover, in closing argument, the prosecutor repeatedly invited the jury to "fill in the blanks" in the redacted statements and referred to the defendant as the leader of a "team" with a "plan to kill" for which he was legally accountable.

In view of *Cruz*, a codefendant's statement must be considered presumptively unreliable when it interlocks with the defendant's own statement, which he seeks to deny the truth of at their joint trial. Hence, it is no longer admissible unless, as the Supreme Court stated in the case of *Lee v. Illinois* (1986), 476 U.S. 530, 90 L. Ed. 2d 514,

106 S. Ct. 2056, there is independent evidence to substantiate the codefendant's statement. In *Lee*, the Supreme Court reversed the conviction of Millie Lee which had resulted from the trial court's acceptance of codefendant Edwin Thomas' statement concerning the homicidal intent of the couple. In *Lee* the victims were dead and the only evidence of a premeditated murder plan was found in Thomas' statement, which differed from Lee's only as to the existence of a premeditated plan. The court held that Lee's trial should have been severed from Thomas' and that, at the new trial, the State would have to provide independent grounds for admitting Thomas' statement.

▆▆ ▆ Generally, Illinois law treats a codefendant's statement as inadmissible hearsay. (*People v. Tyner* (1964), 30 Ill. 2d 101, 105, 195 N.E.2d 675.) Although *Cruz* does not rule out the admissibility of all codefendant statements, it does prevent admission of interlocking statements unless there are independent indicia of their reliability. (*Cruz v. New York* (1987), 481 U.S. ___, ___, 95 L. Ed. 2d 162, 172, 107 S. Ct. 1714, 1719; see *People v. Tyner* (1964), 30 Ill. 2d 101, 195 N.E.2d 675.) Here, since the trial court's denial of severance was based on the grounds rejected by the United States Supreme Court during the pendency of this appeal, defendant Lincoln's conviction must be reversed and the case remanded for a new trial. (See *People v. Johnson* (1986), 148 Ill. App. 3d 163, 178, 498 N.E.2d 816, 826.) Also, as required by *Lee*, the State will have to provide an independent basis for the admission of codefendants' statements in any new trial. *Cf. People v. Gibson* (1987), 156 Ill. App. 3d 459.

▆▆ Additionally, because we do reverse the defendant's convictions here, this court must make a finding concerning the sufficiency of the evidence to prove the defendant guilty beyond a reasonable doubt of the charges herein, in order to insure that the State is not given a second opportunity to produce evidence it failed to muster in the first proceedings and that the defendants are not, thereby, subject to double jeopardy on retrial. (See *People v. Taylor* (1979), 76 Ill. 2d 289, 309, 391 N.E.2d 366, 375.) Here, the evidence against Lincoln concerning the murder of Tony Carter is, in our judgment, insufficient to permit retrial because the killing of Carter was not part of Lincoln's alleged plan "to get" Mitchell and he was not present during the events which led to the killing. None of the statements given to police indicate that there was a plan to kill Carter when the group went to Mitchell's apartment.

▆▆ On the other hand, we find that the evidence produced at trial in relation to defendant's attempted murder convictions of Mitchell and Eskridge was sufficient to support the verdict. The evidence

here as to the plan to get Mitchell and the group acts in furtherance of the plan against both Eskridge and Mitchell is adequate to permit retrial on the attempted murder charges. (See *People v. Taylor* (1979), 76 Ill. 2d 289, 391 N.E.2d 366.) Accordingly, we reverse Lincoln's murder conviction in the death of Tony Carter, vacate Lincoln's conviction and sentence for the attempted murders of Mitchell and Eskridge, and remand for a new trial on the attempted murder of Mitchell and Eskridge. Our finding here as to the sufficiency of the evidence concerning the defendant's conviction on the attempted murder charges herein, for purposes of double jeopardy, is, of course, not intended to imply any binding determination concerning defendant's guilt or innocence on retrial. 76 Ill. 2d 289, 309, 391 N.E.2d 366, 375.

Finally, in this case, the jury received instructions defining attempt and murder that did not require them to find a specific intent to kill under the attempted murder charges. (Illinois Pattern Jury Instructions, Criminal, No. 7.01 (2d ed. 1981).) The instructions permitted the jury to find Lincoln guilty of attempted murder if he were found to have acted with knowledge that such acts created a strong probability of great bodily harm to another person even if the evidence did not establish that he himself had acted with an intent to kill. An instruction is improper if it fails to make clear that to convict for attempted murder, nothing less than a criminal intent to kill must be shown. (*People v. Harris* (1978), 72 Ill. 2d 16, 27, 377 N.E.2d 28, 33.) The instructions here were error. The instructional error is conceded by the People and we, therefore, note it here only for purposes of guiding the court on retrial.

Accordingly, Lincoln's murder conviction of Tony Carter is reversed, his conviction of the attempt murder of Mitchell and Eskridge is vacated, and the cause is remanded to the circuit court of Cook County for a new trial on the attempted murder charges consistent with this opinion.

Judgment reversed in part, vacated in part, and cause is remanded with directions.

O'CONNOR and MANNING, JJ., concur.