SIXTH DIVISION
August 10, 2007

No. 1-05-3883

THE PEOPLE OF THE STATE OF ILLINOIS,    )          Appeal from the
    )          Circuit Court of
          Plaintiff-Appellee,    )          Cook County, Illinois.
    )
    )
    )          No. 04 CR 13669 (03)
v.    )
    )
TERENCE JONES,    )          Honorable
    )          Stanley J. Sacks,
          Defendant-Appellant.    )          Judge Presiding.

JUSTICE JOSEPH GORDON delivered the opinion of the court:

Following a bench trial in the circuit court of Cook County defendant, Terence Jones, was found guilty of first degree murder and attempted aggravated criminal sexual assault. Defendant was sentenced to consecutive terms of 28 years' and 7 years' imprisonment, respectively. On appeal, defendant contests the sufficiency of evidence to sustain his conviction for first degree murder. Defendant also contends that the trial court abused its discretion in sentencing him, because it did not adequately consider mitigating factors and because it improperly relied upon a fact not in evidence. Defendant finally contends, and the State concedes, that the mittimus must be corrected to reflect that he was convicted of attempted aggravated criminal sexual assault rather than aggravated criminal sexual assault. For the reasons discussed below we affirm and order the mittimus corrected.

1

No. 1-05-3883

## BACKGROUND

Defendant was indicted on 23 charges all stemming from the death of the victim, Alonzo Jones. These included indictments on (1) seven counts of first degree murder, one in violation of section 9-1(a)(1) of the Criminal Code of 1961 (Code), one in violation of section 9-1(a)(2), and five in violation of section 9-1(a)(3); (2) four counts of aggravated kidnaping in violation of section 10-2(a)(3); (3) four counts of aggravated criminal sexual assault, two in violation of section 12-14(a)(1), one in violation of section 12-14(a)(2), and one in violation of section 12-14(a)(4); (4) one count of criminal sexual assault in violation of section 12-13(a)(1); (5) two counts of kidnaping in violation of section 10-1(a)(1); (6) and five charges of aggravated battery, three in violation of section 12-4(a), and two in violation of 12-4(b)(8). See 720 ILCS 5/9-1(a)(1) through (a)(3); 10-2(a)(3); 12-14(a)(1),(a)(2),(a)(4); 12-13(a)(1); 10-1(a)(1); 12-4(a),(b)(8) (West 2000).

At trial, Derrick Fleming testified that on the evening of February 28, 2004, he went to Laquita Calhoun's house near 74th Street and Parnell, to look for his girlfriend, Lakesha Collins. Once there, Fleming was told that Collins was next door at Janette Daniels' house. Together with Calhoun, Fleming proceeded to Daniels' house, where he saw Collins, Daniels, Katherine Calhoun and defendant sitting in the living room. Fleming stated that a few minutes later, Alonzo Jones came out from one of the back rooms with blood running down his wrists. According to Fleming, Laquita Calhoun, Collins and Katherine Calhoun then started questioning Alonzo Jones about Laquita Calhoun's baby, whether he molested or touched her. Alonzo Jones denied the allegations.

2

Fleming averred that Laquita Calhoun then hit Alonzo Jones and that defendant followed by kicking him in the testicles. According to Fleming, a few minutes later, when Laquita Calhoun went to the back room, Collins opened the front door and told Alonzo Jones to run out. Alonzo Jones attempted to escape, but defendant called to Laquita Calhoun, telling her that Alonzo Jones was trying to get away. According to Fleming, Laquita Calhoun ran to the front, grabbed Alonzo Jones by the neck, brought him back inside and threw him down onto the floor. Jones remained on the floor for a few seconds, but then got up and ran to the back of the house.

Fleming testified that at this point, he, Collins and Collins' seven-year-old son, E.O., left the house and went to Collins' apartment. Once there, Collins told Fleming to stay with the boy while she would return to Daniels' house to "calm everything down." Fleming testified that he next saw Collins the next day at 4 p.m. and that she was crying and that she told him that "the boy was dead."

Fleming observed that his car, a four-door green Pontiac Grand Prix, had blood on the inside and outside of the trunk, as well as on the antifreeze bottle. Fleming also saw that the spare tire was not in the trunk but that instead of it the trunk contained a can of lighter fluid. Fleming testified that he panicked and took the car to a car wash where he washed off the blood and threw everything from the trunk into a nearby trash can.

Fleming further testified that soon after the incident, he spoke to police, told them what he had witnessed at Daniels' house, and led them to the trash can and the car wash where he had attempted to clean out his car. Fleming averred that soon afterwards he spoke to the State's Attorney and gave a handwritten statement.

When questioned by the State about that handwritten statement, which appeared to be inconsistent with the statements he had just made at trial, Fleming acknowledged that he had written in that statement that Laquita Calhoun and defendant beat Alonzo Jones in the apartment, that Jones got up and ran, and that Laquita Calhoun and defendant ran after him out of the building, and that after a few minutes, he saw them dragging Alonzo Jones back toward the house. In that statement, Fleming averred that he saw defendant with a broom handle on the porch of Daniels' apartment, hitting Alonzo Jones on the upper back and then dragging him back toward the apartment. Fleming also testified that, at that point, Alonzo Jones was slurring his words, and seemed as if he would faint at any moment.

On cross-examination, Fleming testified that the victim, Alonzo Jones, was mentally challenged and that he slurred his words all the time. Fleming also stated that Alonzo Jones had a room in Daniels' house.

On cross-examination Fleming also testified that he discovered a blood stained broken bottle inside the trunk of his car and that he threw it away, together with the other items he had discovered there.

When questioned by defense counsel about defendant's activities on the evening of the incident, Fleming changed course several times. He first indicated on cross-examination that defendant sat on the couch the entire time that Alonzo Jones attempted to escape the apartment. Fleming also stated that when he left Daniels' apartment with Collins and her son, the last thing he saw was defendant leaving the apartment and walking away to the back of the house. Fleming stated that he never saw defendant reenter Daniels' house.

Fleming then changed course and on redirect examination testified that, as he was leaving Daniels' house, he saw defendant standing on the porch with a metal broomstick in hand and "pulling" Alonzo Jones toward the apartment.

On re-cross-examination, Fleming again changed course and averred that when he was leaving Daniels' apartment it was dark outside and that therefore he could not state with certainty whether he saw defendant or someone else standing on the porch "pulling" Alonzo Jones.

Ezell Jones[1] next testified that on February 28, 2004, he lived with his girlfriend Janette Daniels and Alonzo Jones at 7425 South Parnell Street in Chicago. Ezell Jones testified that on the evening of February 28, 2004, he was sleeping in one of the three back bedrooms in Daniels' apartment. He stated that sometime that evening Daniels came into the room and told him to ask everyone in the apartment to leave. When Jones entered the living room, he saw defendant, Daniels, Collins, Katherine Calhoun and Laquita Calhoun and told them all to leave the apartment. He then returned to the bedroom and fell asleep.

Assistant State's Attorney Mary Bregenzer next testified that, at about 8:40 p.m. on March 2, 2004, she interviewed defendant at Area 1 Violent Crimes in the presence of Detectives Halloran and O'Brien. Bregenzer testified that after she advised defendant of his Miranda rights he indicated that he wished to speak with her and later elected to memorialize his statement by way of videotape. That video was entered into evidence without objection and viewed in open court.

_____

[1]The record reflects that Ezell Jones is not related to either defendant, Terence Jones, or the victim, Alonzo Jones.

5

According to defendant's videotaped statement, on February 28, 2004, he lived on the first floor of a two-flat located at 7419 South Parnell Street, next door to Daniels' building. Defendant averred that on the evening in question, he went to a card party on the first floor of Daniels' building. Daniels and Laquita Calhoun were on the first-floor porch, with Laquita Calhoun speaking to someone on the telephone. Defendant stated that from her conversation, it appeared to him that "something" was going on. The girls soon went upstairs and defendant went inside the first-floor apartment. However, about 10 minutes later, he became curious and went upstairs to Daniels' apartment. Defendant stated that Daniels, Laquita Calhoun, Katherine Calhoun, Ezell Jones, Alonzo Jones, Collins, Fleming and Daniels' three children were all inside the apartment. According to defendant, when he walked into the apartment, Laquita Calhoun was accusing Alonzo Jones of "raping her baby." Soon thereafter, Laquita Calhoun and Alonzo Jones went into Daniels' room for about a minute. When they came back into the living room, Laquita Calhoun pushed Alonzo Jones down to the floor and punched and kicked him in the face.

Defendant stated that at that point he too punched Alonzo Jones in the eye because he "raped *** the little girl."[2] Defendant then hit Alonzo Jones with a broom handle on his hand, legs and arms about 20 times. Defendant averred that he also pulled down Alonzo Jones' pants and tried to "stick the broomstick up his bootie" because Alonzo Jones had raped a child. After a couple of seconds Alonzo Jones pulled his pants up, and defendant "chilled out."

Defendant testified that Collins then "got to feeling sorry for [Alonzo Jones]" and opened the front door to let him out of the apartment. According to defendant, at this time, Alonzo Jones

---

[2]As defendant indicated: "I don't like no grown mans raping no little girls (inaudible)."

was a little beaten up and was bleeding on the arm and from the mouth from where he got kicked. After Alonzo Jones ran out of the apartment to the first-floor neighbor's apartment, Laquita Calhoun followed by defendant and some of the others went after him. Laquita Calhoun eventually found Alonzo Jones outside, behind the house, and dragged him to the front, forcing him to go up the stairs. According to defendant, Alonzo Jones was now limping and appeared "woozy." Defendant stated that he hit Alonzo Jones on the porch three times with the broom stick. Laquita Calhoun then dragged Alonzo Jones upstairs and back into the apartment. Defendant remained outside, "talking around."

Defendant next averred that shortly thereafter Collins, who had left earlier, pulled up in a car, parked in front of the house, and went upstairs. A few minutes later, defendant saw Collins, Laquita Calhoun, and Katherine Calhoun dragging Alonzo Jones outside, onto the porch and then into the trunk of Collins' car. According to defendant, Alonzo Jones was screaming, telling the girls to leave him alone, and tried to block the trunk lid with his leg, but Laquita Calhoun slammed it on his ankle. Defendant testified that he saw the girls drive off with Alonzo Jones, that he then returned to his own apartment and that he did not see the girls again that night. Defendant averred that he did not know where the girls were going when they drove off with Alonzo Jones.

Defendant also indicated that at the time of the incident he was 19 years old, that he had been treated well at Area 1 by police detectives and that he was giving the videotaped statement freely and voluntarily.

The parties then stipulated that Chicago police officer Perner would testify that at about

7

8:11 a.m. on February 29, 2004, he was flagged down by an individual at approximately 57th Street and South Wabash by an individual who pointed out a body lying in the alley of the 5600 block of South Michigan Avenue.[3]

Detective William Brogan next testified that at 4:30 p.m. on February 29, 2004, he was assigned to investigate Alonzo Jones's murder. After speaking with Alonzo Jones's family, he spoke with Daniels, Fleming and Collins. According to Detective Borgan, Fleming took him to a car wash located at 79th Street and Halsted and showed him the dumpster where he had thrown out the items he had found in the trunk of his car after Collins returned with it on the morning of February 29, 2004. Those items were still in the trash can.

Detective Borgan next stated that about 3 a.m. on March 2, 2004, he went to the 7400 block of South Parnell Street to find defendant and observed a man matching defendant's description standing on the corner. After defendant ran, Detective Borgan chased him down and arrested him in the foyer of his residence located at 7419 South Parnell.

The parties next stipulated that if forensic investigator Tovar were called as a witness he would testify that on March 2, 2004, at 2:35 a.m. he responded to the scene of 4920 South Halsted, where there was a car wash, and that he took photos of that car wash and the surrounding area, including yellow metal trash bins. Tovar would further testify that he examined a 1995 Pontiac Grand Prix and that he recovered several blood swabs from the undercarriage of that vehicle.

The parties further stipulated that forensic expert Brian Smith would testify that he took

---

[3]That body was later identified as that of the victim, Alonzo Jones.

several photos of Daniels' apartment, as well as the entranceway and the stairways located at 7425 South Parnell. Smith would further testify that he recovered blood swabs from, among other places, the exterior side of the front entrance door of that building, as well as from the bannister of the stairway inside the building leading to the second-floor apartments.

Dr. Mitra Kalelkar, assistant chief medical examiner, next testified that on March 1, 2004, she performed an autopsy on the victim, Alonzo Jones. Dr. Kalelkar testified that the external examination revealed a total of 41 blunt force injuries and 14 sharp force injuries on Alonzo Jones's body. These, among other things, included blunt force injuries to Alonzo Jones' head, numerous abrasions and scrapes on his face, chest and abdomen, as well as gravel marks consistent with a body being run over by a vehicle and being dragged along the road.

Dr. Kalelkar also testified that she found numerous sharp force injuries, like "cutting wounds" on the front of Alonzo Jones's wrists. She suspected that these were "hesitation marks," *i.e.*, marks made by a person who is trying to slash his own wrists but does not have the strength to go deep and cut any blood vessels.

According to Dr. Kalelkar, the internal examination showed extensive rib fractures, lacerations to the right lung, and about 65 mililiters of blood inside Alonzo Jones's right chest cavity. The examination also revealed hemorrhages underneath the victim's scalp, but none within the brain or subdural space.

Dr. Kalelkar concluded that within a reasonable degree of scientific and medical certainty, it was her opinion that Alonzo Jones died as a result of multiple blunt and sharp force injuries to his body, including crushing injuries of the chest. In her opinion, the manner of death was

homicide.

On cross-examination, Dr. Kalelkar explained that the cause of death was "fail chest," *i.e.* multiple rib fractures of the right chest, which caused bleeding inside the chest cavity, which in turn stopped Alonzo Jones's breathing. Dr. Kalelkar testified that these injuries revealed that the victim was run over by a vehicle at least once. She also stated that the victim could have survived the blunt force injuries.

On cross-examination, Dr. Kalelkar testified that at the request of the detectives involved in the investigation of the case, she had performed a second postmortem examination to inspect Alonzo Jones's anal area. This examination revealed no injuries to the anus or to the anal rim. After the testimony of Dr. Kalelkar, the State rested.

As part of his case in chief defendant offered two stipulations. First, the parties stipulated that if called to testify, Radiah Ellis would testify that she did not observe a body in the alleyway of the 5600 block of South Michigan Avenue, when she was driving through it at about 2 a.m. on February 29, 2004. Next, if called to testify, Sharon Keeble would aver that between 3 a.m. and 4 a.m. on February 29, 2004, she was in her apartment facing the west alley between 5700 and 5600 South Michigan Avenue when she heard people yelling and screaming in that alleyway.

The trial court found defendant guilty of (1) felony murder based on aggravated kidnaping, (2) knowing first degree murder based on accountability, and (3) attempted aggravated criminal sexual assault. In making this finding, the trial court stressed that instead of allowing the police to investigate allegations that Alonzo Jones abused Laquita Calhoun's daughter, defendant acted as a vigilante.

10

The trial court also noted that defendant was the first one to come up with a weapon against Alonzo Jones, namely, the broomstick, and that defendant's actions in hitting Alonzo Jones made it easier for the women to put Alonzo Jones in the trunk. The court noted that defendant's help in dragging Alonzo Jones back to the apartment constituted kidnaping, and that he knowingly attached himself to a group that was bent on exacting revenge on Alonzo Jones for allegedly abusing Laquita Calhoun's daughter. The court stressed that even though defendant saw the women put Alonzo Jones into the trunk of the car while Alonzo Jones protested, he stood and did nothing. As the court stated:

"Where can he possibly think they're taking the guy [Alonzo Jones] at that point, what to a hospital that's why they throw him in the trunk of the car and slam a trunk on him to take him to the hospital?

He [Alonzo Jones] lives right there. If you're going to leave him there a and not do anything else to him just leave him right there. It is obvious when they drive off with Alonzo Jones in the trunk screaming I didn't do it, let me out, or words to that effect that additional force is contemplated against Alonzo Jones. No, maybe [defendant] did not know *** they [would] run over him with the car ***. Maybe he didn't know that the people would stab him with the broken bottle whatever else they stabbed him with maybe he didn't know those particular specifics things but he knew darn well more bad things were going to happen to Alonzo Jones which he certainly helped the best he could to let them happen to Alonzo Jones."

At the sentencing hearing, in aggravation, the State introduced a victim impact statement which explained that Alonzo Jones was mentally challenged and was often taken advantage of by people who claimed to be his friends, particularly because of his social security check. Daniels was one of these people. According to the impact statement, Alonzo Jones's death hastened the death of his mother, who had already been in poor health.

In mitigation, defense counsel disclosed that defendant was now only 20 years old, that he had no prior criminal convictions or juvenile adjudications, and that he expressed remorse for his participation in the offense. Defendant made a statement in allocution.

The trial court subsequently sentenced defendant to consecutive terms of 28 years' imprisonment for first degree murder and 12 years' imprisonment for aggravated criminal sexual assault. When reminded that defendant was convicted of attempted aggravated criminal sexual assault, the trial judge reduced the 12-year sentence to 7 years. The mittimus currently reflects that the 7-year sentence was for aggravated criminal sexual assault, and not attempted aggravated criminal sexual assault.

ANALYSIS

1. Sufficiency of Evidence

On appeal, defendant first contends that the evidence presented at his trial was insufficient as a matter of law to sustain his conviction for the charge of first degree murder. We disagree.

At the outset, we reject defendant's contention that this issue presents a question of law, subject to *de novo* review. In support of this contention, defendant cites to People v. Smith, 191

12

No. 1-05-3883

Ill. 2d 408, 411 (2000), where our supreme court held that where facts of the case are not in dispute, defendant's guilt is a question of law, which should be reviewed *de novo*. Unlike in the present case, in Smith, the court was essentially asked to construe the meaning of a statute as it applied to the undisputed facts of that case. Moreover, unlike in Smith, here defendant is specifically asking this court to review the trial court's findings of fact that defendant's conduct contributed to Alonzo Jones's death, based on the conflicting testimony of Fleming and defendant.

As such, the facts are in dispute and the standard of review is not *de novo*.

Rather, the applicable standard of review requires us to determine whether defendant's conviction was against the manifest weight of the evidence. People v. Ervin, 297 Ill. App. 3d 586, 590 (1998). Under this standard, when considering a challenge to the sufficiency of the evidence the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. People v. Hall, 194 Ill. 2d 305, 330 (2000). The weight to be given the testimony, the credibility of the witnesses, the resolution of conflicting testimony, and the reasonable inferences to be drawn from the evidence are the responsibility of the trier of fact. People v. Walensky, 286 Ill. App. 3d 82, 97 (1996); People v. Milka, 211 Ill. 2d 150, 178 (2004). A reviewing court will not set aside a criminal conviction unless the evidence is so unreasonable, improbable, or unsatisfactory as to justify reasonable doubt of the defendant's guilt. Hall, 194 Ill. 2d at 330.

In this case, defendant was convicted of first degree murder on three grounds: (1) that he

13

was accountable for the intentional or knowing infliction of injuries which killed Alonzo Jones (see 720 ILCS 5/9-1(a)(1) (West 2000)); (2) that he was accountable for the infliction of these injuries knowing that there was a strong probability that they would cause great bodily harm (see 720 ILCS 5/9-1(a)(2) (West 2000)); and (3) that he performed several acts which caused the victim's death, during the commission of a forcible felony of aggravated kidnaping (see 720 ILCS 5/9-1(a)(3) (West 2000)).

We initially note that there is no issue raised as to whether the physical injuries that defendant inflicted on Alonzo Jones actually caused Alonzo Jones's death.[4] Defendant asserts and the State concedes that defendant was not present during the murder. Therefore, the only issues that remain are whether there was sufficient evidence presented at trial to find defendant guilty of (1) felony murder and/or (2) knowing first degree murder under accountability principles.

We first address knowing murder by accountability. Under sections 9-1(a)(1) and (a)(2) of the Criminal Code an individual can be found guilty of first degree murder in two situations.

> "A person who kills an individual without lawful justification commits first degree murder if, in performing the acts which cause the death:
>
> (1) he either intends to *** do great bodily harm to that individual *** or *knows*

---

[4]The undisputed evidence presented at trial shows that while defendant admitted to hitting Alonzo Jones with a broomstick approximately 23 times, as well as punching him, the medical examiner who performed the autopsy, testified that Alonzo Jones died as a result of a collapsed chest, which was consistent with injuries caused by being run over by a car.

*that such acts will cause death to that individual* ***; or

(2) he *knows* that such acts create a strong probability of death or great bodily harm to that individual ***[.]" (Emphasis added). 720 ILCS 5/9-1(a)(1), (a)(2) (West 2000).

In Illinois, a person is legally accountable for another's criminal conduct when, "[e]ither before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." 720 ILCS 5/5-2(c) (West 2000); People v. Taylor, 164 Ill. 2d 131, 140 (1995). To prove that defendant possessed the intent to promote or facilitate the crime, the State must present evidence which shows beyond a reasonable doubt that either defendant shared the criminal intent of the principal or there was a common criminal design. People v. Perez, 189 Ill. 2d 254, 266 (2000). A defendant's mental state is ordinarily proved circumstantially by inferences reasonably drawn from the evidence. See People v. Earl, 104 Ill. App. 3d 846 (1982).

Under the "common design rule," where two or more persons engage in a common criminal design or agreement, any acts in the furtherance of that common design committed by one party are considered to be the acts of all parties to the design or agreement and all are equally responsible for the consequences of the further acts. Perez, 189 Ill. 2d at 267. Proof of the common purpose or design need not be supported by words of agreement, but may be drawn from the circumstances surrounding the commission of the unlawful conduct. Taylor, 164 Ill. 2d at 141. Evidence that defendant voluntarily attached himself to a group bent on illegal acts, with knowledge of its design, supports an inference that he shared the common purpose and will

15

sustain his conviction for an offense committed by another. See Taylor, 164 Ill. 2d at 141; see also Perez, 189 Ill. 2d at 267 ("[a]ccountability may be established through a person's knowledge of and participation in the criminal scheme, even though there is no evidence that he directly participated in the criminal act itself"); People v. Cooper, 194 Ill. 2d 419, 435 (2000) ("[a] conviction under accountability does not require proof of a preconceived plan if the evidence indicates involvement by the accused in the spontaneous acts of the group").

In the present case, viewing the evidence in light most favorable to the prosecution, we find that defendant's own videotaped statement was sufficient to establish that he voluntarily attached himself to a group bent on illegal activities so as to support an inference of common design to sustain his conviction for the murder of Alonzo Jones. The record reveals that in his own videotaped statement, defendant indicated that standing on the first-floor porch of Daniels' building, he overheard Laquita Calhoun's telephone conversation from which it appeared to him that "something" was going on. After Laquita Calhoun went upstairs to Daniels' apartment, defendant waited a few minutes, but then "became curious" and voluntarily followed her. Once inside Daniels' apartment defendant saw Laquita Calhoun accusing Alonzo Jones of "raping her baby" and kicking Alonzo Jones in the face. Defendant's statement further establishes that at this point out of his own accord he punched Alonzo Jones in the eye, hit him about 20 times with a metal broomstick and then took it upon himself to pull down Alonzo Jones' pants to "stick the broomstick up his bootie," because he had "raped *** the little girl." The record further shows that when Collins opened the front door of apartment to let Alonzo Jones escape, defendant alerted Laquita Calhoun and together with her ran down the stairs to catch him. After Laquita

16

Calhoun found Alonzo Jones behind the house and dragged him to the front, forcing him to go back up the stairs, defendant by his own admission stood on the porch and hit the nearly unconscious victim three times with the same broomstick he had already used in beating the victim inside the apartment. The record further reveals that defendant remained outside and soon thereafter observed Collins, Laquita Calhoun, and Katherine Calhoun dragging Alonzo Jones outside, onto the porch and then into the trunk of Collins' car, with the victim screaming to be freed, and with Laquita Calhoun slamming the trunk door on his ankle to get him inside. As such, it was reasonable for the trial court to infer that since the victim had already been severely beaten his return for "more bad things" to happen could well encompass his ultimate demise at their hands. We therefore conclude that viewed in the light most favorable to the prosecution, there was sufficient evidence to support the conclusion of the trier of fact that defendant participated in the beating and aggravated kidnaping of Alonzo Jones, thereby aiding and abetting the perpetration of his murder for which he is therefore accountable. See People v. Peters, 144 Ill. App. 3d 310 (1986) (holding that evidence establishing that defendant approached the victim's car, tried to control the victim when she became hysterical at the sight of the codefendant's gun, carried her kicking and screaming to the codefendant's house, allowed the codefendant to rape her, recapture her upon her escape and subsequently kill her, was sufficient to sustain a conviction for first degree murder under accountability principles despite defendant's testimony that he was merely present at the codefendant's house when the murder was committed and that he continually opposed the commission of any crime); see also People v. Rybka, 16 Ill. 2d 394, 405-06 (1959) (holding that evidence establishing that two defendants, although not present when the

victim was attacked, admitted that they were present when a mob of codefendants were talking about "getting a Negro" and that they left a store with the other codefendant with such intention was sufficient to sustain a conviction for murder under accountability principles); Taylor, 164 Ill. 2d at 141-42 (holding that defendants could be found guilty of first degree murder under accountability principles where the evidence showed that although defendant did not actively participate in the shooting of the victim, he was aware that the shooter wanted to kill the victim, that the shooter had a weapon, and that the shooter had instructed the driver of the car in which defendant was riding to find the victim, and defendant stayed with the group having this knowledge).

In coming to this conclusion, we have reviewed the case of People v. Lincoln, 157 Ill. App. 3d 700 (1987), cited by defendant and find it inapposite. In Lincoln, defendant and three accomplices planned to kill Donald Mitchell. Lincoln, 157 Ill. App. 3d at 702. After arriving at Mitchell's apartment, which was also occupied by Eskridge and Carter, defendant followed Eskridge to Mitchell's bedroom and instructed one of his codefendants to shoot Mitchell in the head. Lincoln, 157 Ill. App. 3d at 702. After being pushed out of the bedroom by Mitchell and Eskridge, the codefendant fired two shots through the door. Lincoln, 157 Ill. App. 3d at 702. Defendant and the codefendant then burst through the bedroom door and ran down the back stairs. Lincoln, 157 Ill. App. 3d at 702. After leaving the scene of the crime, defendant and codefendant learned that while they were trying to kill Mitchell, the second codefendant killed Carter in the living room. Lincoln, 157 Ill. App. 3d at 703. Remanding the cause for a new trial

18

on other grounds,[5] the appellate court found that defendant could not be retried for Carter's murder, because that killing was not part of defendant's original plan "to get" Mitchell and because defendant was not present during the events which led to the killing. Lincoln, 157 Ill. App. 3d at 706.

Unlike in Lincoln, however, where there was no evidence that defendant had entered into any common plan to cause harm to Carter or that he in fact inflicted injuries on Carter, in the present case, as noted above, it is undisputed that defendant intended to beat Alonzo Jones for allegedly raping Laquita Calhoun's baby and that he helped Laquita Calhoun return Alonzo Jones to Daniels' apartment for "other bad things to happen to him," thereupon resulting in his murder.

Defendant nevertheless contends that even if the State can prove that he had the requisite intent for accountability through the common design theory, he should not be held accountable for the knowing murder of Alonzo Jones because he withdrew from the common enterprise long before the murder took place. We disagree.

A defendant's membership in a common criminal enterprise is presumed to continue until he detaches himself from the criminal enterprise. People v. Ruiz, 94 Ill. 2d 245, 256 (1982). In order to effectively withdraw from a criminal enterprise, defendant cannot merely withdraw, but must communicate his intent to withdraw. See Rybka, 16 Ill. 2d at 406 ("it is the communication of intent to withdraw and not the naked fact of withdrawal that determines whether one who advised, encouraged or incited another to commit a crime is to be released from liability as an

---

[5]The appellate court found that the trial court improperly denied defendant's motion for severance.

accessory"); see also <u>People v. Gilbert</u>, 194 Ill. App. 3d 184, 189 (1990) ("[t]he trier of fact must be able to find that the accused wholly and effectively detached himself from the criminal enterprise before the crime is in the process of consummation or has become so inevitable that it cannot reasonably be stayed"). According to section 5-2(c)(3) of the Code, defendant may communicate his withdrawal from a crime in three ways: (1) by wholly depriving the group of the effectiveness of his prior efforts in furtherance of the crime; (2) giving timely warning to the proper law enforcement authorities; or (3) otherwise making proper efforts to prevent the commission of the crime. See 720 ILCS 5/5-2(c)(3) (West 2000).

In the present case the record reveals that defendant did none of these things. In fact, after helping Laquita Calhoun beat and bring the limping and nearly unconscious Alonzo Jones back inside Daniels' apartment, defendant remained in front of the house "talking around," as if nothing of consequence had occurred. More importantly, when a few minutes later he observed Laquita Calhoun, Katherine Calhoun and Collins drag the screaming victim from the apartment and into Collins' car trunk, defendant stood aside and did nothing. In fact, after the girls drove off with Alonzo Jones he went home and never alerted the police.

Defendant next contends that there was insufficient evidence presented at trial to find him guilty of felony murder. We disagree.

Under the felony-murder statute, a person who kills an individual without lawful justification commits first degree murder if, in performing the acts which cause the death, he is attempting to or committing a forcible felony, other than second degree murder. See 720 ILCS 5/9-1(a)(3) (West 2000). Kidnaping is a forcible felony for purposes of the felony murder

20

No. 1-05-3883

statute. See 720 ILCS 5/2-8, 9-1(a)(3) (West 2000).

To prove defendant guilty of felony murder, the State was required to prove beyond a reasonable doubt both the fact of death and the criminal agency causing death. People v. Fuller, 141 Ill. App. 3d 737, 748 (1986). Felony murder derives its mental state from the underlying intended offense. People v. Johns, 345 Ill. App. 3d 237, 242 (2003). Felony murder seeks to deter persons from committing foreseeable felonies by holding them responsible for murder if a death results. Johns, 345 Ill. App. 3d at 242. A defendant may be found guilty of felony murder regardless of a lack of intent to commit murder. Johns, 345 Ill. App. 3d at 242. Illinois law follows the proximate cause theory of liability for felony murder. People v. Dekens, 182 Ill. 2d 247, 249 (1998) (holding that for the felony-murder rule to attach, the act causing the death must both occur during the underlying felony and be the direct and proximate result of the felony).

The focus of the proximate cause theory of liability is whether the defendant's actions "set in motion a chain of events that ultimately caused the death of the decedent." People v. Lowery, 178 Ill. 2d 462, 473 (1997). The State need not prove that defendant's acts constituted the sole and immediate cause of death (People v. Martin, 112 Ill. App. 3d 486, 499 (1983)), but rather must show that defendant's acts were a contributing cause of death, such that death did not result from a source unconnected with or independent of those acts (see Fuller, 141 Ill. App. 3d at 748; see also Dekens, 182 Ill. 2d at 249 (a defendant's criminal acts are the proximate cause of a person's death if they contribute to that person's death and the death is not caused by an intervening event unrelated to the defendants acts); People v. Paulson, 80 Ill. App. 2d 44 (1967) (noting that an intervening cause, completely unrelated to the acts of defendant, relieves a

21

defendant of criminal liability); People v. Hudson, 222 Ill. 2d 392, 401 (2006), quoting 1 W. LaFave, Substantive Criminal Law §6.4, at 464 (2d ed. 2003) ("Foreseeability is added to the cause-in-fact requirement [of proximate cause] because 'even when cause in fact is established, it must be determined that any variation between the result intended *** and the result actually achieved *is not so extraordinary that it would be unfair to hold the defendant responsible for the actual result.*' [Citation.]"(Emphasis added.))).

Defendant can escape felony-murder liability only by establishing that he overtly withdrew from the commission of or attempted commission of the forcible felony. See People v. Mills, 252 Ill. App. 3d 792, 799 (1993). The same rules of withdrawal that apply to accountability, and which we have discussed above, apply to felony-murder principles as well. See People v. Brown, 26 Ill. 2d 308, 312-13 (1962). Just as under accountability principles, defendant must timely communicate his intent to withdraw in such a manner so that it is possible for the trier of fact "'to say that the accused had wholly and effectively detached himself from the criminal enterprise before the act with which he is charged is in the process of consummation or has become so inevitable that it cannot reasonably be stayed.' " Brown, 26 Ill. 2d at 313, quoting People v. Nichols, 230 N.Y. 221, 229, 129 N.E. 883, 885 (1921). Stated differently, "withdrawal may not be effectively made from a felony murder when the 'transaction which immediately begets it has actually been commenced.' " Brown, 26 Ill. 2d at 313, quoting Nichols, 230 N.Y. at 229-30, 129 N.E. at 886.

In the present case, the underlying felony was aggravated kidnaping. According to section 10-1 of the Code, the crime of kidnaping occurs when an individual knowingly and secretly

confines another person against that person's will or by force or threat of imminent force carries the person from one place to another with intent secretly to confine him against his will. See 720 ILCS 5/10-1 (West 2002); see also People v. Thomas, 163 Ill. App. 3d 670, 675-76 (1987). Aggravated kidnaping is defined as a kidnaping in which a kidnaper "[i]nflicts great bodily harm *** or commits another felony upon his victim." 720 ILCS 5/10-2(a)(3) (West 2000).

In the present case, the record reveals that the kidnaping began when Collins opened the front door of apartment to let Alonzo Jones escape, but defendant alerted Laquita Calhoun and together with her ran down the stairs to catch him. The aggravated kidnaping occurred when, after Laquita Calhoun found Alonzo Jones behind the house and dragged him to the front, forcing him to go back up the stairs, defendant by his own admission stood on the porch and hit the victim three times with the same broomstick he had already used in beating the victim inside the apartment. As noted above, the record further reveals that without withdrawing from the criminal enterprise, defendant remained outside and soon thereafter observed Collins, Laquita Calhoun, and Katherine Calhoun dragging Alonzo Jones outside, onto the porch and then into the trunk of Collins' car, with the victim screaming to be freed, and with Laquita Calhoun slamming the trunk door on his ankle to get him inside. As such, viewing the evidence in light most favorable to the prosecution, we find that there was sufficient evidence presented at trial to show that defendant "set in motion a chain of events" which ultimately caused Alonzo Jones's death. See Lowery, 178 Ill. 2d at 473.

Defendant nevertheless contends that there is insufficient evidence to find him guilty of felony murder because the murder was committed in context of a second and separate kidnaping

in which he took no part. Although defendant concedes that he kidnaped Alonzo Jones when he aided Laquita Calhoun in dragging the victim to the apartment, he contends that this kidnaping should be separated from the action taken by Collins, Laquita Calhoun and Katherine Calhoun in dragging the victim from the apartment and into the trunk of Collins' car. Defendant contends that his participation in the initial return of the victim to the house in and of itself constitutes a completed kidnaping and that therefore he should not have been charged with participation in the taking of the victim to the automobile, which he contends is a "second kidnaping" from which the murder resulted and for which he is not accountable.

In support of his contention defendant relies on People v. Dennis for the proposition that for purposes of accountability, Illinois courts look to the elements of the crime, rather than the *res gestea*, *i.e.*, series of continuous events surrounding the offense. See People v. Dennis, 181 Ill. 2d 87, 98 (1998). Defendant then cites to People v. Landis, 66 Ill. App. 2d 458, 464 (1966), for the proposition that "the crime of aggravated kidnaping is *complete* when the kidnaper inflicts great bodily harm or commits another felony upon his victim," (emphasis added), and that, therefore, once defendant hit Alonzo Jones inside the house and then on the porch, the crime of aggravated kidnaping was over. Although defendant relies on the holding in Dennis primarily with respect to felony murder, presumably he would make the same contention with the charge of accountability alone. In either context, for the reasons that follow, we find defendant's contention without merit and that case inapposite.

Defendant's reliance on Dennis is misplaced. In Dennis the supreme court analyzed when participation in an armed robbery, which commenced subsequent to the completion of that armed

24

robbery, would render the participant accountable for the crime. Dennis, 181 Ill. 2d at 102-03. The supreme court found that under the circumstances of that case the armed robbery was completed before the escape took place and that therefore defendant's assistance in that escape, rendered after the fact, was not sufficient to retroactively charge him with the preceding crime of armed robbery. Dennis, 181 Ill. 2d at 102-03.

In Dennis, the evidence presented at trial established that defendant, his fiancee and Jones drove to an alleyway with the intent to purchase heroin. Dennis, 181 Ill. 2d at 91. Defendant parked his car behind a garbage truck, allowed Jones to exit the car, and then made a right turn into a T-shaped alleyway because he did not want to be close to the drug house. Dennis, 181 Ill. 2d at 90-91. While waiting, defendant did not see that Jones approached another vehicle that was parked in the alleyway and that at gunpoint he robbed two victims. Dennis, 181 Ill. 2d at 90. Instead, the next thing that defendant saw was Jones being chased by an unknown male. Dennis, 181 Ill. 2d at 91. When Jones arrived at defendant's car, defendant leaned to his fiancee and told her to open the door. Dennis, 181 Ill. 2d at 91. Jones jumped into the car and, panicking, told defendant to go. Dennis, 181 Ill. 2d at 91. At that time, defendant, unaware of what had actually occurred, thought that perhaps there had been a "drug bust." Dennis, 181 Ill. 2d at 91. Defendant sped off in the car. It was only then that he saw that Jones was carrying a radio and that Jones showed him the gun. Dennis, 181 Ill. 2d at 91. Defendant was subsequently charged and convicted of armed robbery based on accountability principles. Dennis, 181 Ill. 2d at 91. In reversing the trial court's decision, our supreme court held that by the time defendant aided in the escape, the commission of the armed robbery had ended because both "force and taking, the

25

elements which constitute[d] the offense [of armed robbery], had [already] ceased." Dennis, 181 Ill. 2d at 103. In that regard, the court held that the offense was complete because not only had the property been taken, but the threat of force, an element of armed robbery, had ceased *before* the escape occurred. Dennis, 181 Ill. 2d at 91.

In the present case, unlike in Dennis, the "force or threat of imminent force" innate in the statutory definition of kidnaping (see 720 ILCS 5/10-1 (West 2000)), and a prerequisite for aggravated kidnaping (see 720 ILCS 5/10-2(a)(3) (West 2000)), had not ended when defendant remained on the porch. Instead, as a direct result of defendant's actions, the victim had been returned to the apartment where that threat of force continued, and the victim was once again in the hands of the mob leader, Laquita Calhoun.[6]

In addition, unlike in Dennis, in the present case defendant's assistance and participation took place during the actual commission of the predicate crime leading up to the ultimate death. Here, there was one forward movement, with one victim, one mob, and one overall shared

---

[6]We note that in that respect defendant's citation to Landis, for the proposition that the crime of aggravated kidnaping had been completed when defendant struck Alonzo Jones on the porch, is misconstrued. In that case, the issue was at what point kidnaping becomes an aggravated kidnaping, so that the crime actually begins. See Landis, 66 Ill. App. 2d at 461-62. Despite the use of the word "complete," the court in that case did not consider the duration of the commission of the crime of aggravated kidnaping or whether that crime had ended, but merely considered whether the elements of the crime of aggravated kidnaping were met so that the kidnaping could rise to the level of aggravated kidnaping. See Landis, 66 Ill. App. 2d at 463.

26

objective to harm Alonzo Jones, starting with the initial assault of the victim and ending in his murder in the alleyway. Moreover, unlike in Dennis, defendant here voluntarily attached himself to the mob knowing that they were pent on hurting and kidnaping Alonzo Jones, and escalated the initial assault by being the first to strike the victim with a weapon and the first to sexually assault him.

Moreover, even if Dennis did not apply to the accountability charge, by no means would it apply to the felony murder charge where the court in Dennis clearly distinguished between these types of offenses and stated that for purposes of felony murder the underlying felony should not be measured by the statutory elements of that felony but, rather, by the entire felony venture and by the proximate cause test. In emphasizing this point, the court in Dennis stated:

> "[W]e are not inclined [] to extend the felony-murder escape rule [which holds that if a killing occurs in the course of an escape from a robbery, the escape is within the operation of the felony-murder rule] to apply in accountability cases. Certain policy considerations inform our decision. Felony murder and accountability have theoretically different underpinnings. Felony murder seeks to deter persons from committing forcible felonies by holding them responsible for murder if a death results. [Citation.] Because of the extremely violent nature of felony murder, we seek the broadest bounds for the attachment of criminal liability. For that reason, in felony murder, a defendant's liability is not limited to his culpability for commission of the underlying felony. A defendant may be found guilty of felony murder regardless of a lack either of intent to commit murder

[citation], or even connivance with a codefendant [citation]. Our continued adherence to a proximate cause approach is further exemplary of how broadly we seek to extend the reaches of criminal liability in the case of felony murder. [Citation.]

Unlike felony murder, accountability focuses on the degree of culpability of the offender and seeks to deter persons from intentionally aiding or encouraging the commission of offense. Holding a defendant who neither intends to participate in the commission of an offense nor has knowledge that an offense has been committed accountable does not serve the rule's deterrent effect."

Dennis, 181 Ill. 2d at 105.

In that respect we find the case of People v. Peters, 144 Ill. App. 3d 310 (1986), to be helpful. In that case, just like here, defendant contended on appeal that the charged felony of aggravated kidnaping ended when the victim momentarily escaped from codefendant's house after her abduction, and that although she was recaptured and subsequently killed by codefendant, defendant had not participated in the "second" kidnaping, which resulted in the victim's death. Peters, 144 Ill. App. 3d at 323. The appellate court disagreed and found that for purposes of felony murder there was only one kidnaping because there had been one continuing course of conduct unbroken by any independent, intervening cause. Peters, 144 Ill. App. 3d at 324. As the court in Peters emphasized:

"[T]he indictment charging defendant with aggravated kidnaping did not distinguish between a 'first' and 'second' abduction but rather referred to the

crime of aggravated kidnaping ***. Thus, the indictment was sufficient to include all actions of the defendant for the entire time cited in the indictment. *** Moreover, the kidnaping was a continuing course of conduct despite defendant's attempt to show the victim 'escaped.' In actuality, the victim momentarily fled [codefendant's] house. Her immediate recapture, while still bound by handcuffs and half-naked, reflects that no 'escape,' *i.e.*, 'evasion of or deliverance from what confines, limits or holds' one [citation], occurred. The entire evening and early morning activities of [codefendant] and defendant constituted one continuing course of conduct unbroken by any independent, intervening cause." Peters, 144 Ill. App. 3d at 323-24.

In the present case, just as in Peters, the victim was continually under the control of the mob, led by Laquita Calhoun, from the time that defendant beat and chased him down the stairs of the house through the time that he observed the victim being dragged and placed inside Collins' car trunk, and until his final demise. As such, we are compelled to find that for purposes of felony murder, the series of events that took place constituted one ongoing and uninterrupted chain of events, which proximately resulted in the death of the victim, thereby establishing defendant's guilt of first degree felony murder.

## 2. Sentencing

Defendant next contends that the court abused its sentencing discretion by imposing a term eight years more than the minimum. He specifically maintains that the sentence is excessive given his age (20 at the time of sentencing), lack of criminal background (no prior criminal

convictions or juvenile adjudications), expression of remorse, and limited involvement in the crime (*i.e.*, the fact that he did not inflict any of the fatal blows and that he was not present when the victim was killed). Defendant also contends that the trial court improperly characterized his expression of remorse as an aggravating factor when it remarked that defendant probably regretted not having participated in the actual murder. For the reasons that follow, we disagree.

The trial is the proper forum for sentencing and it will be afforded great deference in its sentencing decision. People v. Coleman, 166 Ill. 2d 247, 258 (1995). Where, as here, a sentence imposed by the trial court is within the statutory limits permitted for the felony of which defendant was convicted[7] (730 ILCS 5/5-8-1(a)(3) (West 2000)), we will not disturb the sentence absent an abuse of discretion by the court. Coleman, 166 Ill. 2d at 258.

In the preset case, we cannot say that the trial judge abused its discretion in sentencing defendant to 28 years' imprisonment. Contrary to defendant's contention, the trial court did not ignore all the mitigating factors in his favor. The record reveals that, before sentencing, mitigating factors, including a presentencing report were presented to the trial court. Because defendant offers no evidence, aside from the sentence itself, that the trial court failed to consider the mitigating evidence, we may assume that the trial court properly considered it. See People v. Jarrell, 248 Ill. App. 3d 1043, 1051 (1993) (a trial court need not articulate the process by which it determines the appropriateness of a given sentence); People v. Tirado, 254 Ill. App. 3d 497 (1993) (the trial court need not expressly indicate its consideration of mitigating factors, and

[7]In the present case, defendant was convicted of first degree murder, which mandates a sentence between 20 and 60 years' imprisonment. 730 ILCS 5/5-8-1(a)(1)(a) (West 2000).

absent evidence to the contrary other than the sentence imposed, is presumed to have considered mitigating factors brought before it); People v. Powell, 159 Ill. App. 3d 1005, 1011 (1987) (where the presentence report is before the court, it is presumed that the court considered defendant's potential for rehabilitation).

In addition, we note that after hearing the evidence in mitigation, at sentencing the trial court specifically commented on defendant's allocution indicating that it did not believe that defendant was sorry for what had happened to the victim but, rather, that he was sorry for getting caught.

The record further shows that the court heard evidence in aggravation and considered the nature and circumstances of the offense, particularly the fact that defendant was an "extremely active" participant in the beating of the victim both inside and outside the apartment making it possible for the mob to transport him to the alley where he was eventually killed. See People v. Bowman, 357 Ill. App. 3d 290, 304 (2005) (when determining the proper sentence to impose, the trial court may consider the particular facts of each case, including the nature and circumstances of the offense). The trial judge also predicated the sentence on the gravity of the offense, which he characterized as one of the "most horrific murders" he had ever presided over.[8] See People v. Hernandez, 204 Ill. App. 3d 732, 740 (1990) ("the seriousness of the crime has been called the most important factor to be considered in imposing sentence"). As such, we will not take it upon

_____

[8]At the conviction stage of the proceedings, the trial court indicated: "I have presided over some of the most horrific murders you can imagine in the Cook County, Illinois. This case is right up there in the top two or three for brutality."

ourselves to reweigh the factors involved in the court's sentencing determination (Coleman, 166 Ill. 2d at 262) or substitute our judgment for that of the sentencing court merely because we could or would have weighed the factors differently (People v. Streit, 142 Ill. 2d 13, 19 (1991)).

Defendant nevertheless contends that the trial court erred in not considering defendant's absence from the scene of the murder as a mitigating factor. In support of this contention, defendant cites to an isolated comment by the trial court: "From [defendant's] viewpoint, maybe he missed the party. *** All he missed by not being there from his viewpoint unfortunately [was] probably missing the fun of seeing his accomplices kill the man." We disagree.

When determining whether a sentence was excessive, we will not focus on isolated words or statements of the trial court but, rather, consider the record as a whole. People v. Sutton, 252 Ill. App. 3d 172, 191 (1993). Here, the trial court's comments, considered *in toto*, simply reflect that based on the degree of defendant's participation, the court did not believe that defendant's absence from the actual murder would substantially mitigate his crime. Rather, the focus of the trial court was on the brutality of the crime and on the erosive impact of vigilante justice on our legal system.

### 3. Mittimus

Defendant finally contends that the mittimus must be corrected to reflect that he was convicted of attempted aggravated criminal sexual assault rather than aggravated criminal sexual assault. We agree.

At the conclusion of the bench trial, the trial court pronounced from the bench that defendant was guilty of attempted aggravated criminal sexual assault. At the sentencing hearing,

the trial court initially orally sentenced defendant to a 12-year term for aggravated criminal sexual

assault, but after being reminded by defense counsel that defendant had only been found guilty of

the inchoate offense of attempted aggravated criminal sexual assault, the court reduced the

sentence from 12 to 7 years.  Contrary to the court's oral pronouncement that it was sentencing

defendant to 7 years for attempted aggravated criminal sexual assault, defendant's mittimus

reflects a sentence of 7 years but a conviction for aggravated criminal sexual assault.

The oral pronouncement of the judge is the judgment of the court, and the written order

of commitment is merely evidence of that judgment.  People v. Smith, 242 Ill. App. 3d 399, 402

(1993).  When the oral pronouncement of the court and the written order are in conflict, the oral

pronouncement controls.  Smith, 242 Ill. App. 3d at 402; People v. DeWeese, 298 Ill. App. 3d 4,

13 (1998).

In the present case, the judgment order, which reflects a conviction for aggravated

criminal sexual assault, does not conform to the court's oral pronouncement at either the

conviction or sentencing stage where the court made clear that it was convicting and sentencing

defendant for attempted aggravated criminal sexual assault.  The State concedes that the mittimus

should be corrected to reflect the proper conviction imposed by the court.  Pursuant to Supreme

Court Rule 615(b)(1), we order the clerk of the circuit court to make the necessary corrections.

134 Ill. 2d R. 615(b)(1) ("[o]n appeal the reviewing court may *** modify the judgment or order

from which the appeal is taken"); see also People v. McCray, 273 Ill. App. 3d 396, 403 (1995)

("[r]emandment is unnecessary since this court has the authority to directly order the clerk of the

circuit court to make the necessary corrections); People v. Deweese, 298 Ill. App. 3d 4, 13

(1998) (correcting the mittimus to reflect the proper conviction).

Accordingly, we direct the clerk of the circuit court to amend the mittimus to reflect that defendant was convicted of attempted aggravated criminal sexual assault rather than aggravated criminal sexual assault.

Affirmed; mittimus corrected.

FITZGERALD SMITH, P.J., and O'MALLEY, J., concur.