2020 IL App (1st) 161737-U

FOURTH DIVISION
February 27, 2020

No. 1-16-1737

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE APPELLATE COURT
OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

|  |  |  |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 11 CR 8101 (02) |
| CARRI COOK, | ) ) ) | |
| Defendant-Appellant. | ) ) ) ) ) ) | Honorable Luciano Panici, Judge Presiding. |

_____

JUSTICE REYES delivered the judgment of the court.
Presiding Justice Gordon and Justice Lampkin concurred in the judgment.

**ORDER**

¶ 1    *Held*:   Affirming the judgment of the circuit court where the defendant was not prejudiced by trial counsel's failure to request the proper withdrawal jury instruction and where the defendant's claim her sentence was unconstitutional as applied was premature.

¶ 2    Following a jury trial, defendant Carri Cook was convicted of two counts of first degree

murder, attempted armed robbery, and home invasion under an accountability theory in the shooting deaths of Frank Brassel and Echford Cooper. She was sentenced to the mandatory sentence of natural life without parole for the murder convictions, 21 years for home invasion, and four years for attempted armed robbery. On appeal, defendant asserts that: (1) her trial counsel was ineffective for agreeing to an improper jury instruction that undermined her only viable defense; and (2) her sentence is unconstitutional under the eighth amendment of the United States Constitution and the proportionate penalties clause of the Illinois Constitution as applied to her where she had limited culpability in the murders and no criminal history. For the reasons that follow, we affirm.

¶ 3                                BACKGROUND

¶ 4      On May 23, 2011, defendant was indicted with multiple offenses arising from a home invasion and robbery during which her accomplice, Gene Lewis, shot and killed Brassel and Cooper. The State proceeded to trial on eight counts of first degree murder (under the accountability theory), two counts of home invasion, and one count of attempted armed robbery.

¶ 5      At trial, the State presented the following evidence. On April 20, 2011, at 11:24 a.m. Sergeant LaVandus Kirkwood of the Harvey Police Department was dispatched to a house on the 15000 block of Myrtle Avenue in Harvey, Illinois. Upon arriving to the home, he discovered Brassel lying on the front porch and Cooper lying on the bedroom floor next to his wheelchair. Neither showed signs of life. The medical examiner testified that Brassel and Cooper died of gunshot wounds due to a homicide. Brassel had two gunshot wounds to the head and chest and Cooper had one gunshot wound to the head. Darrel Stafford, a crime scene investigator with the Illinois State Police, testified that he recovered four 9 mm fired casings from the kitchen/dining room, two .45 caliber fired casings from the front porch, and one .45 caliber fired casing from

the bedroom. He also recovered $7272 from the front left pocket of Brassel's pants.

¶ 6    Officer Jason Banks of the Harvey Police Department testified that on April 20, 2011, at 11:37 a.m. he was assigned to investigate a person seeking treatment for a gunshot wound at Ingalls Memorial Hospital. Upon arrival, he encountered defendant and Ashonni Cotton. They informed him that Lewis had been shot. Officer Banks was unable to speak with Lewis as he was obtaining medical treatment at the time. However, when he attempted to interview defendant she had already left the hospital.

¶ 7    The State published a surveillance video of the entrance to Ingalls Memorial Hospital. Officer Banks testified that the video depicted Cotton assisting Lewis out of an automobile driven by defendant.

¶ 8    Brandon Johnson, defendant's brother, testified that on April 20, 2011, defendant told him that Lewis was shot at a park and she took him to the hospital. Johnson then went to the area where the shooting occurred. When he returned home, he asked defendant if Lewis had been shot in the 15000 block of Myrtle Avenue where the homicides took place. Defendant responded, "yes" and stated that Cotton had also been present. Defendant also told him that it happened at a man named Frank's house and she had arranged to meet up with him so they could rob him.

¶ 9    Johnson testified that defendant told him she and Cotton ran from the house before the victims were shot. During his grand jury testimony, however, Johnson testified that defendant told him she was in the house when the shooting occurred. Johnson's grand jury testimony further indicated that defendant had a plan to run out of the house so Brassel would not think she was involved in the robbery. Johnson's grand jury testimony further revealed that defendant knew that Lewis and Michael Reed would be coming to Brassel's home with firearms as part of

the plan.

¶ 10    On cross-examination, Johnson testified that on April 27, 2011, the police executed a search of his home with the consent of another resident. The police found crack cocaine, a scale, bags used to package cocaine, and ammunition. As a felon, it was illegal for Johnson to have possession of the ammunition. Johnson was arrested and provided a statement to the police about defendant's involvement in the murders of Brassel and Cooper. On April 29, 2011, Johnson testified about defendant's involvement before a grand jury. While Johnson testified he was not provided anything from the State in exchange for his grand jury testimony, he was never charged with any crime related to his possession of the cocaine and the ammunition.

¶ 11    Assistant State's Attorney Kellyn Coakley testified that on April 28, 2011, she was assigned to the felony review unit of the State's Attorney Office. She was notified by the Harvey Police Department to interview defendant. She was aware that defendant had voluntarily come to the police station on April 26, 2011. The interview had been videotaped and the video was admitted in evidence and published to the jury without objection.

¶ 12    The videotape depicts an hour and 45-minute interview defendant had with ASA Coakley and an unnamed detective at the Harvey police station on April 28, 2011. In the videotape defendant acknowledged that she would be waiving her *Miranda* rights and informed ASA Coakley and the detective as follows. Defendant first met Brassel on Friday, April 15, 2011, at a gas station. Defendant, a painter, was wearing her work clothes when Brassel approached her and introduced himself as a general contractor. He spoke with her about a potential job and requested that defendant call him.

¶ 13    On Monday, April 18, 2011, defendant called Brassel and went over to his house. Brassel spoke to her about potential painting work that needed to be done. He also asked

defendant about her relationship status and indicated he was interested in "partying" with her. Later that evening defendant's automobile battery had died while parked in front of Cotton's house. Defendant told Brassel her battery had died and he offered to come by and help her jump her vehicle. Brassel came to Cotton's house and defendant introduced Brassel to Cotton. After jumping defendant's vehicle, Brassel pulled out a "wad" of money in front of defendant and Cotton. Brassel gave defendant $20 for gas and then defendant and Cotton went to the gas station without Brassel.

¶ 14    Later that evening, defendant and Cotton ran into Lewis and Reed on the street. Defendant picked them up in her vehicle and they drove by Brassel's house so she could thank him for the money. While they were in the vehicle, defendant told Cotton about Brassel offering her a job.

¶ 15    On Tuesday, April 19, 2011, she spoke with Brassel on the phone about Cotton. Brassel indicated that he liked Cotton and wanted to get together with her. On Wednesday, April 20, 2011, Brassel called defendant and asked what she and Cotton were doing. Defendant then called Cotton and Cotton indicated she was willing to meet up with Brassel. Defendant picked up Cotton and they made their way to Brassel's house. One block from Brassel's house, defendant observed Lewis and Reed standing outside next to Lewis's vehicle wearing all black. Defendant then pulled up to Brassel's house. As she approached the front door, defendant said hello to a man in a wheelchair who was sitting on the front porch.

¶ 16    Brassel indicated he wanted to speak with defendant alone so they went to the back of the house while Cotton went to the bathroom. Brassel asked defendant if Cotton would be willing to have sex with him for money. At that moment, Lewis rushed in holding a black, automatic handgun and he demanded Brassel give him the money. She had never noticed Lewis with a

handgun before, but she had observed Reed with one. Brassel told Lewis the money was in the basement. Defendant ran out the front door and to her automobile. As she entered her vehicle, she heard one gunshot. Then she observed Brassel come out to his driveway carrying a handgun similar to Lewis'. Brassel yelled, "I got you b***" in her direction. Defendant then drove away with Cotton to where Lewis' vehicle was located to determine if Reed was there. As she was driving on the block behind Brassel's house she observed Lewis and Reed come out of a gangway. Reed waved defendant down and put Lewis in the back of her vehicle.

¶ 17    Defendant drove to the hospital. While in the vehicle, Lewis told her that Brassel told him the money was in the basement, but there was a dog in the basement that attacked him and then Brassel shot Lewis. Defendant dropped Lewis off at the hospital. In the hospital parking lot she met with Reed who instructed her to tell the hospital staff that Lewis had been shot in the park.

¶ 18    The ASA and detective asked defendant to fill in some holes in her story and defendant then provided the following information in response to their inquiries. On Monday, April 18, 2011, when defendant was driving with Cotton, Lewis, and Reed, Cotton said that defendant "just found her a good ass trick." Reed asked how much money Brassel had on him and Cotton responded, "a wad." Defendant explained to the ASA and detective that Brassel had numerous $100 bills and some $20 bills. The group then devised a plan to steal Brassel's money and split it between them. Reed asked where Brassel lived and they drove by Brassel's house. Lewis and Reed intended to rob Brassel that evening, but it was becoming late so they did not. Reed instructed defendant to set up a date with Brassel the next day.

¶ 19    On Tuesday, April 19, 2011, the plan was for defendant to call Brassel and tell him her vehicle needed a jump. Defendant would be on an isolated road near a warehouse and then

Lewis and Reed would rob Brassel. Defendant texted Brassel, but at the wrong number hoping he would not respond. Brassel later called her and told her that he was partying at a motel. She drove with Cotton to the motel while Lewis and Reed drove separately in a van. Defendant observed Brassel's automobile in the motel parking lot. Lewis and Reed parked next to Brassel's vehicle and waited for him. Defendant then drove away and dropped Cotton off at her home. Defendant drove herself home.

¶ 20    On Wednesday, April 20, 2011, Brassel called defendant early in the morning. At that time, defendant was unaware if Lewis and Reed had robbed him the night before. Brassel indicated that he wanted to get together with her and Cotton to party. Defendant called Cotton and went to Cotton's house. At some point while defendant was at Cotton's home, Cotton called Reed. After that phone call, Cotton informed defendant that they would be robbing Brassel that day. Cotton further informed defendant that the plan was for them to enter Brassel's house and when Lewis and Reed came in for them to run away. Defendant stated to the ASA and detective that "we had taken advantage of Wednesday when he called" and acknowledged that they were "only supposed to have robbed him."

¶ 21    At the close of the State's evidence, defendant moved for a directed verdict, which was denied. The defense rested. In closing, the State argued that defendant assisted in planning and executing the home invasion and robbery of Brassel and that she should be convicted of Brassel and Cooper's murders under an accountability theory. In response, defense counsel maintained that defendant withdrew from the robbery where the evidence demonstrated she was not in agreement to rob Brassel and did not assist in the robbery. Defense counsel also noted that lack of eyewitness evidence, telephone records, and other witness testimony linking defendant to the offenses as charged. Defense counsel further argued that Johnson's testimony was not credible

where he fabricated information about defendant to avoid being charged with additional felonies. Thereafter, the jury was instructed and deliberated, ultimately finding defendant guilty of two counts of first degree murder (720 ILCS 5/9-1(a)(1) (West 2010)), attempted armed robbery (720 ILCS 5/8-4(a), 18-2(a) (West 2010)), and home invasion (720 ILCS 5/12-11(a)(3) (West 2010)). Defendant filed a motion for a new trial, which was denied.

¶ 22    The trial court ordered a presentence investigation report and the matter proceeded to a sentencing hearing where the State argued, in part, that defendant should be sentenced to mandatory natural life under section 5-8-1(a)(1)(c)(ii) of the Unified Code of Corrections (730 ILCS 5/5-8-1(a)(1)(c)(ii) (West 2016)) due to the fact she was responsible for causing the deaths of two individuals. In mitigation, defense counsel argued that defendant had no prior criminal history or gang involvement. He further argued that defendant was less culpable where she did not shoot and kill the victims. Defense counsel requested the minimum mandatory sentence for the double murder and that the sentences for the remaining counts be merged into those counts. Defendant then spoke in allocution. Defendant apologized for her actions and expressed her deep sorrow and remorse for her part in the deaths of the victims. Defendant pleaded with the court to sentence her in a way that she would be able to be reintegrated into society.

¶ 23    The trial court then read defendant's presentence investigation report into the record and sentenced defendant to mandatory natural life without parole for the two counts of first degree murder. The court further sentenced defendant to the minimum 21 years' imprisonment for home invasion, and the minimum four years for attempt armed robbery. Defendant did not request the court reconsider her sentence. This appeal followed.

¶ 24                                    ANALYSIS

¶ 25    On appeal, defendant asserts that: (1) her trial counsel was ineffective for agreeing to an

improper jury instruction that undermined her only viable defense; and (2) her sentence is unconstitutional under the eighth amendment of the United States Constitution and the proportionate penalties clause of the Illinois Constitution as applied to her where she had limited culpability in the murders and no criminal history. We address each issue in turn.

¶ 26                                       Ineffective Assistance of Counsel

¶ 27    Defendant first contends her counsel was ineffective for agreeing that the jury be instructed with Illinois Pattern Jury Instructions, Criminal, No. 5.04 (4th ed. 2000) (Responsibility For Act Of Another-Withdrawal) (hereinafter IPI Criminal 4th). Defendant asserts this jury instruction undermined her only viable defense, that she had withdrawn from the conspiracy to rob Brassel. Specifically, defendant maintains that the "timely warning" phrase of IPI 5.04 was improper where there was no evidence that she contacted the police. Accordingly, defendant argues that her defense counsel provided ineffective assistance in failing to present a proper version of IPI 5.04, as the addition of the "timely warning" phrase precluded the jury from finding that she withdrew from the conspiracy, which in turn, precluded any chance of acquittal under the defense's theory of the case.

¶ 28    In response, the State asserts that, even assuming defense counsel erred in not objecting to the particular version of the withdrawal instruction tendered, defendant was not prejudiced as the evidence presented at trial did not support any withdrawal instruction.

¶ 29    We begin with the familiar principles for resolving claims of ineffective assistance as provided by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, a defendant must demonstrate that his counsel's performance was deficient and that he was prejudiced as a result. *Id.* at 687. To demonstrate deficient representation, a defendant must establish his counsel's performance fell below an objective standard of

reasonableness. *Id.* at 688. Judicial scrutiny of a counsel's performance is highly deferential, such that a court must indulge in a strong presumption that the counsel's conduct fell within the wide range of professional assistance. *Id.* at 689. To demonstrate prejudice, the defendant must establish there is a reasonable probability that, but for counsel's deficient representation, the result of the proceeding would have been different. *Id.* at 694. The Supreme Court advised that "[a] reasonable probability is a probability sufficient to undermine the confidence in the outcome" of the proceeding. *Id.* Moreover, because the defendant must satisfy both parts of the *Strickland* test, if an ineffective assistance claim can be disposed of on the ground of lack of sufficient prejudice, a court need not consider the quality of the attorney's performance. *Id.* at 697.

¶ 30 Our supreme court has further advised that the right to effective assistance of counsel refers to competent, not perfect, representation. *People v. Palmer*, 162 Ill. 2d 465, 476 (1994). In other words, *Strickland* only requires a fair trial for the defendant; one that is free of errors so egregious that they, in all probability, caused the conviction. *People v. Sharp*, 2015 IL App (1st) 130438, ¶ 101.

¶ 31 Defendant here was charged with the offenses under a theory of accountability. A defendant is "legally accountable for the conduct of another when he solicits, aids, abets, agrees or attempts to aid another in the commission of a crime." *People v. Ross*, 329 Ill. App. 3d 872, 885 (2002). Section 5-2(c) of the Criminal Code of 1961 (Code) (720 ILCS 5/5-2(c) (West 2010)), however, provides that an individual may withdraw from an offense as follows:

> "A person is not so accountable, however, unless the statute defining the offense
>
> provides otherwise, if:
>
> (1) he or she is a victim of the offense committed;

(2) the offense is so defined that his or her conduct was inevitably incident to its

commission; or

(3) before the commission of the offense, he or she terminates his or her effort to

promote or facilitate that commission and does one of the following: (i) wholly deprives

his or her prior efforts of effectiveness in that commission, (ii) gives timely warning to

the proper law enforcement authorities, or (iii) otherwise makes proper effort to prevent

the commission of the offense." 720 ILCS 5/5-2(c) (West 2010).

A defendant's participation in a common criminal enterprise is presumed to continue until he

detaches himself from it. *People v. Jones*, 376 Ill. App. 3d 372, 386 (2007). To properly

effectuate withdrawal so as to warrant such an instruction at trial, the defendant "cannot merely

withdraw, but must communicate his intention to withdraw" in a timely manner as described

(*id.*), thereby "taking some step to 'neutralize' the effect of his conduct" (*People v. Trotter*, 299

Ill. App. 3d 535, 540 (1998)). Accordingly, without such evidence presented at trial, a

withdrawal instruction is improper. See *People v. Tiller*, 94 Ill. 2d 303, 315 (1982) (withdrawal

instruction not warranted where the defendant, who participated in robbery, did not wholly

deprive his efforts of effectiveness by merely leaving the store and telling an accomplice not to

hurt victim because he did not show any affirmative act which would have deprived his efforts of

their effectiveness).

¶ 32     Illinois Pattern Jury Instruction 5.04 entitled "Responsibility For Act Of Another-

Withdrawal" tracks the language of section 5-2(c) of the Code and provides as follows:

"A person is not legally responsible for the conduct of another, if, before the

commission of the offense charged, he terminates his effort to promote or facilitate the

commission of the offense charged and [(wholly deprives his prior efforts of

effectiveness in the commission of that offense) (gives timely warning to the proper law enforcement authorities) (makes proper effort to prevent the commission of that offense)]." IPI Criminal 4th, No. 5.04.

The committee note indicates that the court should use the "applicable bracketed material." The instruction provided to the jury here only included the "gives timely warning" language from the bracketed material.

¶ 33 Defendant does not maintain that the jury instruction improperly stated the law, but instead argues that this instruction, offered by the State, does not accurately reflect the evidence. Defendant asserts that this instruction undermined her theory of the case, causing her prejudice where the evidence demonstrated that she wholly deprived her prior efforts of effectiveness and she made a proper effort to prevent the commission of the offense. Specifically, defendant argues the evidence established that she did not intend to rob Brassel on April 20, 2011, and she purposely did not inform Lewis and Reed that she was contacted by Brassel because she feared they would rob him. We do not find this argument persuasive.

¶ 34 The evidence presented at trial fails to demonstrate defendant was entitled to any withdrawal defense. After speaking with Brassel on the telephone on April 20, 2011, defendant immediately informed Cotton and the two planned to go to Brassel's home. Although defendant stated her intention was to merely "party" with Brassel, defendant was aware that Cotton contacted Reed and had informed Reed they were going to Brassel's house. Cotton then told defendant the plan was for them to enter Brassel's house, and when Lewis and Reed entered, for them to run out. This is exactly what occurred. See *Ross*, 329 Ill. App. 3d at 886 ("The best evidence that [the defendant] did not wholly deprive the enterprise of his efforts is that the crime he planned took place."). After Cotton so informed defendant, defendant drove Cotton to

Brassel's home. On the way there, she passed Lewis and Reed. They were parked one block from Brassel's home dressed in all black. Defendant parked her vehicle, not in the driveway, but across the street. She entered Brassel's home, spoke with him, and when Lewis appeared holding a handgun, she and Cotton ran out of the house. Thereafter, she drove to the block behind Brassel's house, picked up an injured Lewis, and drove him to the emergency room. See *People v. Quiroz*, 229 Ill. App. 3d 241, 246 (1992) (evidence of post crime behavior of defendant is competent to demonstrate participation in the offense itself). At no point did defendant do anything that would indicate she withdrew from the robbery. See *Tiller*, 94 Ill. 2d at 314-15 (the defendant failed to demonstrate an affirmative act which deprived his prior efforts in support of the robbery of their effectiveness); *Ross*, 329 Ill. App. 3d at 886 (trial court's refusal to provide the withdrawal jury instruction was not error were there was no evidence to support a withdrawal theory). Accordingly, defendant cannot demonstrate she was prejudiced by the jury instruction to which her attorney failed to object.

¶ 35    Defendant argues, however, that she is entitled to a proper withdrawal instruction where there is even "slight evidence" that justifies giving the instruction. The "slight evidence" upon which defendant relies is her testimony that she intended to go over to Brassel's home to "party" and she did not personally inform Lewis and Reed that she would be going there. Defendant maintains that because the jury could have believed her version of events that there is slight evidence to warrant a proper withdrawal instruction. Although a defendant is entitled to have the jury instructed on her theory of the case where there is even slight evidence to support it (*People v. Barnard*, 208 Ill. App. 3d 342, 349-50 (1991)), as discussed, the evidence here does not support a withdrawal instruction. While defendant may have had these subjective intentions, there was absolutely no evidence that she communicated this intent to anyone. See *Ross*, 329 Ill.

App. 3d at 886 ("It is the communication of intent, not the naked fact of withdrawal, that determines whether a defendant is released from accountability liability."); *Jones*, 376 Ill. App. 3d at 386. Indeed, her actions belied this intent. Moreover, defendant cites no case where a failure to communicate with her co-conspirators alone is enough to warrant a withdrawal instruction.

¶ 36    Defendant further argues that the jury instruction prejudiced her because it introduced "conflicting law" by adding an element to the withdrawal instruction that was unnecessary and unsupported by the evidence. To support her argument, defendant cites a phrase from *People v. Bush*, 157 Ill. 2d 248, 254 (1993), wherein our supreme court stated, "the giving of conflicting instructions, one of which is a correct statement of law and the other an incorrect statement of law, is not harmless error." In *Bush*, however, the trial court erroneously instructed the jury with a non-IPI instruction concerning the limited-authority doctrine that misstated the law. *Id.* Here, in contrast, the jury was not presented with an instruction that misstated the law, but instead was provided with an instruction unsupported by the evidence. As previously discussed, no evidence of withdrawal was presented to the jury, therefore, there could be no prejudice to defendant.

¶ 37    In sum, based on the evidence presented we cannot say there was a reasonable probability the outcome of defendant's trial would have been different had the jury been provided with an alternative withdrawal instruction. Accordingly, we conclude that defendant failed to sufficiently demonstrate she suffered prejudice and her ineffective assistance of counsel claim fails.

¶ 38                                    Sentence

¶ 39    Defendant next contends that her mandatory sentence of natural life imprisonment violates both the eighth amendment of the United States Constitution (U.S. Const., amend. VIII)

and the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11) as applied to her. Defendant asserts that applying the same sentencing scheme against her as would be applied against a defendant who committed intentional murder violates the eighth amendment's prohibition against cruel and unusual punishment. Defendant further maintains that her sentence is unconstitutional under the proportionate penalties clause because a natural life sentence is disproportionate to her limited culpability and forecloses the possibility of life outside of prison.

¶ 40     In response, the State argues that because defendant was an adult when she committed the offense, the imposition of a mandatory life sentence is presumed constitutional for those found guilty under accountability principles. The State also asserts that defendant was not just passively accountable for the two murders, but instead took an active role by participating in three plans to rob Brassel. According to the State, but for defendant's participation in these events, the victims' deaths would not have occurred.

¶ 41     We initially observe that defendant argues that her sentence violates the eighth amendment and proportionate penalty clause as applied to her. The distinction between facial and as-applied constitutional challenges is crucial. *People ex rel. Hartrich v. 2010 Harley-Davidson*, 2018 IL 121636, ¶ 11. A party raising a facial challenge must establish that the statute is unconstitutional under any possible set of facts, while an as-applied challenge requires a showing that the statute is unconstitutional as it applies to the specific facts and circumstances of the challenging party. *Id.* ¶ 12; *People v. Rizzo*, 2016 IL 118599, ¶ 24; *People v. Thompson*, 2015 IL 118151, ¶ 36. All as-applied constitutional challenges are, by definition, dependent on the specific facts and circumstances of the person raising the challenge. " 'Therefore, it is paramount that the record be sufficiently developed in terms of those facts and circumstances for

purposes of appellate review.' " *Hartrich*, 2018 IL 121636, ¶ 31 (quoting *Thompson*, 2015 IL 118151, ¶ 37). As observed by our supreme court:

> " ' "A court is not capable of making an 'as applied' determination of unconstitutionality when there has been no evidentiary hearing and no findings of fact. [Citation.] Without an evidentiary record, any finding that a statute is unconstitutional 'as applied' is premature." ' " *Rizzo*, 2016 IL 118599, ¶ 26 (quoting *People v. Mosley*, 2015 IL 115872, ¶ 47, quoting *In re Parentage of John M.*, 212 Ill. 2d 253, 268 (2004)).

¶ 42 We find our supreme court's recent decision in *People v. Harris*, 2018 IL 121932, to be instructive. In that case, the 18-year-old defendant was convicted of first degree murder, attempted first degree murder, and aggravated battery with a firearm. *Id.* ¶ 1. He was sentenced to a mandatory minimum aggregate term of 76 years' imprisonment. *Id.* The defendant appealed his sentence, maintaining that, as applied to him, it violated the proportionate penalties clause of the Illinois Constitution. *Id.* The appellate court agreed and the State appealed. *Id.*

¶ 43 In concluding his as-applied challenge was premature, our supreme court observed that the defendant did not raise his as-applied constitutional challenge in the trial court. *Id.* ¶ 40. Due to this failure, no evidentiary hearing was conducted regarding his constitutional claim and the trial court did not make any findings of fact on the defendant's specific circumstances. *Id.* Accordingly, the record had not been sufficiently developed to address his constitutional claim. *Id.* ¶ 45.

¶ 44 Similarly, defendant here failed to raise her as-applied constitutional challenge in the trial court. Indeed, defendant did not even request the trial court reconsider her sentence. No evidentiary hearing was held on her constitutional claims and the trial court did not make any findings of fact on defendant's specific circumstances. Specifically, the trial court heard no

evidence supporting defendant's position on appeal that a 24-year-old young adult is "more similar to an adolescent than a fully mature adult and is more susceptible to peer pressure." All the trial court had before it was the presentence investigation report and defendant's statement in allocution. Because the record herein has not been developed sufficiently to address her constitutional claims, we find them to be premature. See *id.* ¶ 41. As emphasized by our supreme court, "a reviewing court is not capable of making an as-applied finding of unconstitutionality in the 'factual vacuum' created by the absence of an evidentiary hearing and findings of fact by the trial court." *Id.* (citing *People v. Minnis*, 2016 IL 119563, ¶ 19; *Rizzo*, 2016 IL 118599, ¶ 26).

¶ 45    In reaching this conclusion, we find defendant's reliance on *People v. Leon Miller*, 202 Ill. 2d 328 (2002), and *People v. House*, 2019 IL App (1st) 110580-B, to be misplaced. While our supreme court upheld the trial court's finding that the multiple murder sentencing statute was unconstitutional as applied in *Miller*, the defendant there was a 15-year-old juvenile who decided (in a moment's notice) to act as a lookout at the request of two, older gang members. *Miller*, 202 Ill. 2d at 330-31. Here, in contrast, defendant was a 24-year-old who, over the course of three days, planned and strategized with Cotton, Lewis, and Reed to rob Brassel. Most importantly, when determining that the multiple murder sentencing statute was unconstitutional as applied to the *Miller* defendant, the trial court had facts before it that allowed it to make such a decision. *Id.* at 332, 340-41. In the case before us, defendant presented no constitutional as applied challenge before the trial court and, therefore, no facts were adduced regarding a 24-year-old's capability for reasoning and ability to withstand peer pressure.

¶ 46    We further find *House* to be inapplicable. In that case, the 19-year-old defendant was convicted of murder under an accountability theory where he acted as a lookout while two

individuals were murdered. *House*, 2019 IL App (1st) 110580-B, ¶¶ 4, 14. He had no prior violent criminal history and was encouraged to participate in the offense by other gang members. *Id.* ¶ 33. In concluding the imposition of a mandatory life sentence was unconstitutional as applied to the defendant, the reviewing court's analysis focused on youthful offenders ages 18-21. *Id.* ¶¶ 55-58, 62. The reviewing court did not discuss or stretch its analysis to include offenders six years removed from the age of 18 as was defendant here. See *id.* ¶¶ 47-56.

¶ 47 In sum, we conclude that defendant's as-applied constitutional claims are premature and decline to consider them. We observe, however, that our inability to review defendant's claims does not preclude future review of those claims. Indeed, our supreme court has advised that a criminal defendant may sufficiently develop as-applied challenges before a trial court through the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2018), or through a petition seeking relief from a final judgment under section 2-1401 of the Code of Civil Procedure (735 ILCS 5/2-1401 (West 2018)). See *Thompson*, 2015 IL 118151, ¶ 44.

¶ 48                                    CONCLUSION

¶ 49 For the reasons stated, we affirm the judgment of the circuit court of Cook County.

¶ 50 Affirmed.