2023 IL App (1st) 221227

SIXTH DIVISION
December 29, 2023

No. 1-22-1227

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 21 CR 04031 |
| JOSEPH RAMIREZ, | ) ) ) | The Honorable James B. Linn, |
| Defendant-Appellant. | ) | Judge, presiding. |

PRESIDING JUSTICE ODEN JOHNSON delivered the judgment of the court, with opinion.
Justices Hyman and C. A. Walker concurred in the judgment and opinion.

**OPINION**

¶ 1    Defendant Joseph Ramirez was convicted, after a bench trial, of the aggravated domestic battery of his second wife[1] and sentenced to three years' probation, with the first 100 days to be served in prison.

¶ 2    Defendant, who is not currently incarcerated, appeals his conviction, claiming, first, that the trial court abused its discretion by admitting proof of his prior acts of domestic violence

---

[1]In a case such as this, of domestic violence, we exercise our discretion and choose not to publish the names of his first and second wives, who both testified regarding domestic violence.

against both his first and second wives. Defendant argues that the trial court erred by allegedly failing to conduct "any" balancing test "at all" regarding the evidence's probative value versus its possible unfair prejudice in a bench trial. However, defendant admittedly failed to raise this allegation prior to or during the bench trial, and the trial court explained, when denying defendant's posttrial motion, that it had, in fact, balanced these factors.

¶ 3    Defendant claims that his trial counsel's performance was objectively unreasonable, although the trial court acquitted him of the most serious charge, which was attempted murder. Defendant alleges that his trial counsel's performance was objectively unreasonable for not retaining a medical expert, when the treating physician opined that, while it was possible that the puncture wounds to the back and side of the victim's head were caused by an accident or a fall, it was a "less likely" explanation.

¶ 4    Defendant also claims that no rational fact finder could have found sufficient evidence to establish great bodily harm, despite testimony by both his wife and her hospital-treating physician regarding puncture wounds to the back and side of her head, her multi-day hospital stay, her concussion, and her post-concussion symptoms.[2]

¶ 5    For reasons that we explain in more detail below, we do not find these claims persuasive and affirm.

¶ 6                                    BACKGROUND

¶ 7    The offenses charged in this case all concerned one incident between defendant and his second wife that occurred at their home on February 21, 2022, and that resulted in the wounds to the back and side of her head and her four-day hospitalization. The evidence at trial

---

[2]Defendant makes allegations regarding other counts. However, as we explain below, these counts were merged at sentencing into the one court concerning great bodily injury.

established that defendant, a Chicago firefighter, was 5 feet, 11 inches, and 230 pounds, while the victim, his second wife, weighed less than 90 pounds and was 5 feet tall.[3] At trial, defendant denied various acts of domestic violence alleged by his first wife but did admit to striking her in the head in October 2013 and to hitting her with a bag of his personal belongings in July 2015. Although defendant similarly denied various acts alleged by his second wife, he admitted hitting her on January 8, 2018. Defendant and his first wife met in June 2006, married in October 2013, and divorced in 2015. Defendant and his second wife met in approximately 2016 or 2017 and were still married at the time of trial. We provide below only the facts needed to understand the specific claims that defendant raises on appeal.

¶ 8 Prior to trial, both sides moved to admit prior bad acts. On November 8, 2021, the State moved pursuant to Illinois Rule of Evidence 404(b) (eff. Jan. 1, 2011) to admit proof of defendant's other crimes in order to demonstrate defendant's motive, state of mind, intent, lack of mistake, continued hostility, and propensity to commit domestic violence. The State sought to admit evidence of four prior incidents against the victim, which were each the subject of incident reports by the police. The incidents occurred between January 8, 2018, and September 27, 2020. Defendant was arrested for the first incident on January 4, 2018, but the case was ultimately stricken with leave to reinstate.

¶ 9 The State also sought to admit evidence of five incidents against defendant's first wife, between December 30, 2012, and July 17, 2015. The first three incidents were described in the first wife's petition for an order of protection filed in February 2015. Defendant was arrested for the second to last incident which occurred on February 25, 2015, but the case was stricken

---

[3]Defendant testified at trial that, at the time of the offense, he was 5 feet 11 inches and 230 pounds, while the victim was less than 90 pounds and barely 5 feet tall.

with leave to reinstate. The last incident, which occurred on July 17, 2015, was the subject of a police report, but defendant was not arrested.

¶ 10    On November 30, 2021, defendant also filed a motion pursuant to Rule 404(b). Defendant sought to admit proof of bad acts by the victim in order to demonstrate her motive, intent, preparation, plan and/or knowledge. Specifically, defendant sought to admit evidence regarding one incident between himself and the victim that occurred in the early morning hours of May 27, 2019, while he and the victim were on vacation in Nashville. Defendant alleged that, hours before the Nashville incident, the victim called the hotel and booked a separate room for herself, telling hotel staff that she needed the room " 'just in case.' " Defendant alleged that, at 1:30 a.m. on May 27, the victim made an emergency call to the front desk stating that defendant had battered her, and the hotel security called the police. Defendant alleged that the police arrived, found defendant sober and the victim drunk and without visible injuries, and declined to charge defendant. Defendant's motion alleged that the incident showed the victim's plan to frame defendant and intent to file a false report.

¶ 11    On December 10, 2021, the trial court held a hearing on both motions. Since defendant claims on appeal that the trial court failed to conduct any balancing with regard to the other-crimes evidence, we provide the trial court's statements in detail. Toward the start of the hearing, the court asked defense counsel whether he "anticipated" a bench or jury trial. Counsel replied that, although he anticipated a bench trial, his client "hasn't waived at this point." The trial court responded:

> "THE COURT: Listen, all right. On a bench trial, I am inclined to be a little more
> liberal in letting lawyers, you know, present what they want to present as opposed to—

not as opposed to—but on a jury trial, I would be more strict about making sure about rules and I would balance it a little differently.

I am not going to worry about myself being prejudiced by something I shouldn't be hearing; whereas, I would be certainly more at a jury trial.

[DEFENSE COUNSEL]: Judge, we discussed the State's motion on earlier dates, and the Court had indicated that; so—

THE COURT: I think I told you repeatedly that incidents between the same people, the complainant and the defendant, I don't consider that necessarily proof of other crimes. That's just putting it in context. You are talking about a married couple and things before this day, before he came home and laid on the bed and she laid on the couch, there was a long history.

And to put everything in context, I don't have a problem with either side talking about those incidents. I think that's fair. It goes to interest, motive and bias. It is exactly what you are supposed to consider when you consider the believability of witnesses.

If you are talking about things that are outside the relationship with other people, then we need to discuss it. So tell me about that.

[DEFENSE COUNSEL]: Judge, as to the relationship where they are asking about the wife to testify, we understand that and we are requesting a bench trial."

After listening to defense counsel's proffer about the Nashville incident, the trial court ruled:

"THE COURT: The same person—anything about the same people I don't think I need to give you permission in a pretrial motion. It's the same person. You have permission. That puts everything in context."

5

The court emphasized: "I am going to give both sides latitude about the relationship between the parties."

¶ 12      Regarding the incidents involving defendant's first wife, defense counsel argued against their admission on the grounds that most of the events were unreported to the police, that the evidence was six or seven years old, that the State wanted to admit it to show propensity, and that the incidents involving the first wife were distinguishable because they occurred during the heat of a divorce proceeding. With respect to the incidents involving the first wife, the trial court agreed, in part, with defense counsel and ruled that it would not admit the other-crimes evidence for propensity. However, the court ruled that it would admit it to show absence of mistake and a disproportionate reaction:

> "THE COURT: I am not going to hear the incidents—the alleged incidents with the ex-wife for propensity. There was a report made. And she makes a couple of case reports. Doesn't follow through in court. Never gets vetted other than initial complaints. There is an Order of Protection that is granted. And I am not comfortable saying that that shows propensity.

> But I can say, okay, perhaps it shows absence of mistake. It is going to be aggressive. It is because he is disproportionately reacting to things he perceives about his wife, whether it is first wife or his second wife. I think it can be—it is relevant enough from the proffers that I have heard that I will accept it. I will hear it.

> I don't want to hear about propensity. You are not going to argue propensity, that he is always beating up everybody because I don't think the proffers show enough for allowing me to say propensity; but you can do it for the other reasons I indicated, okay."

¶ 13        On February 8, 2022, defendant signed a written waiver of his right to a jury trial and opted for a bench trial instead. At trial, the State called both wives, as well as (1) Filadelfo Gines and Bartosz Wosniak, paramedics with the Chicago Fire Department, who responded to the scene on February 21, 2021, and provided care for the victim; (2) Eric Schoessow, a uniformed Chicago police officer who also responded to the scene; (3) Matthew Savage, an evidence technician with the Chicago police who processed the scene; and (4) Dr. Terry Chiganos Jr., the emergency room physician who treated the victim. The parties stipulated that Dr. Chiganos was an expert in the field of emergency room medicine. The parties stipulated to clips from a neighbor's surveillance video camera that showed the back view of the home where the incidents occurred. Additional stipulations concerned, among other things, the recovery of a firearm from the bedroom of the home.

¶ 14        Since Dr. Chiganos's testimony regarding the possibility of accident is central to one of defendant's claims on appeal, we provide it in detail. On direct examination, the doctor testified:

"Q. Doctor, based on [the victim's] report of what happened, is it likely that these injuries were self-inflicted?

A. Not based on her report.

Q. Okay. Is it also likely that these injuries on the back of her head resulted from a fall?

A. It's possible, but I can't say for sure.

Q. Is it fair to say it would be unlikely that they would result from a fall? ***

[A.] I would say it's more likely that her injuries are consistent with what she told us. A fall still remains a possibility but in my opinion a less likely one.

Q. Why is that? What makes you say that?

A. Well, she was ultimately diagnosed with a closed sacral fracture, which is a fracture of the lower most portion, inferior portion, of the spine from a fall. And so if she fell and struck her backside first, it would be unlikely that she then subsequently fell and struck the side of her head in multiple locations so as to cause independent hematomas to the temporal, occipital region.

Q. Doctor, just to clarify, when you said—you said multiple hematomas[4] or just one hematoma to the head?

A. She was diagnosed with both temporal and occipital hematomas, temporoparietal and occipital hematomas on [a] CT scan.

Q. So that's at least two or is it more?

A. Two."

¶ 15    On cross-examination Dr. Chiganos testified that these two hematomas were described as puncture wounds in his notes and that he also noted that she was intoxicated. A blood test later revealed that her alcohol level was "315 whole blood." The doctor explained that, "[f]or someone who drinks regularly, they can be perfectly functional at a level of 315." The notes indicated that the victim told another doctor that she consumes three to five alcoholic beverages per day and that she told another doctor that her husband was angry, upset and got his gun and hit her on the back of the head with his gun.

¶ 16    On cross, when asked whether the victim was struck over the head with a heavy item, Dr. Chiganos responded: "That's a possibility, correct." When asked if he had "any idea what

---

[4]On redirect, Dr. Chiganos explained: "A hematoma is just a word for bruising or collection of blood beneath the skin."

she was struck with," he replied: "No." When counsel asked the doctor whether his opinion about the fall was that "it's possible she got the concussion from [a fall] but not likely," the doctor replied simply: "It's possible." About the possibility of a self-inflicted wound, the doctor testified:

"Q. It is possible that those two puncture wounds were self-imposed?

A. It's possible.

Q. And that's called self-injury or cutting?

A. I don't think the wounds were consistent with self-mutilation, but could she have inflicted them upon herself, yes."

The doctor confirmed that it was "possible that the tip of a knife did these two puncture holes." However, on redirect, the doctor explained: "The wounds themselves could have been caused by the tip of a knife. I would find the hematomas evidenced by exam and also the CT scan to be less consistent with just the tip of a knife and more consistent with something blunt."

¶ 17        On March 2, 2022, after the State rested, defense counsel moved and argued at length for a directed finding. After hearing argument by both sides, the trial court granted defendant's motion for a directed finding on count I, the attempted murder charge, but denied his motion with respect to the remaining counts. On April 21, 2022, defendant exercised his right to testify on his own behalf.

¶ 18        After the defense rested on April 21, 2022, the trial court heard closing argument. After defense counsel finished his closing argument, the trial court asked: "are you suggesting to me that the injuries that she had that night are all self-inflicted?" Defense counsel responded:

"[DEFENSE COUNSEL]: "Yes. The doctor said it was a possibility. We don't have to prove anything. All we have to do is prove that Joe didn't do it. And we don't think that the evidence before this court is that Joe caused these injuries, Judge."

After listing to argument from both sides, the trial court found defendant not guilty of count IV, which had charged aggravated domestic battery, in that defendant "intentionally or knowingly caused permanent disfigurement." The trial court explained: "I'm not persuaded that the scar that was caused on the top of her head *** has been a permanent disfigurement to her and so, accordingly, I will give him the benefit of the doubt and I will acquit him as to that count." However, the trial court found defendant guilty of the three other counts, namely, counts II, III and V.

¶ 19        On May 16, 2022, defendant moved to discharge his trial counsel and substitute posttrial counsel. On that same day, trial counsel withdrew his appearance. On July 20, 2022, new counsel filed a posttrial motion for acquittal or a new trial, arguing, among other things, that the trial court "failed to consider 725 ILCS 5/115-20 or conduct the requisite balancing test before admitting other bad acts evidence." With respect to this first issue, the written motion conceded that "Trial Defense counsel failed to provide a written response to the State's motion." The motion further argued that trial counsel was ineffective for several reasons, including for failing to call "an expert" that would have enabled him to argue "that the victim was so drunk she fell and accidentally caused her injuries."

¶ 20        On July 26, 2022, the trial court held a hearing on defendant's posttrial motion. At the hearing, defendant's new posttrial counsel argued that the trial court failed to make specific findings balancing the unfair prejudice of the other-crimes evidence against its relevance. However, posttrial counsel also conceded that trial counsel forfeited this issue:

POSTTRIAL COUNSEL: "The trial court made no specific rulings on relevancy or prejudice but trial counsel requested no—there were no requests for findings. Trial counsel never responded in writing to the State's 16-page motion *in limine*." [5]

¶ 21     The trial court explained that it "bifurcated" its analysis of the other-crimes evidence, treating incidents involving the victim differently from the incidents involving the first wife. With respect to incidents involving the victim and defendant, the trial court observed:

"THE COURT: "[F]irst of all, it's a two-way street. I didn't know if this was going to be more helpful to the defense, but to put everything—just to show interest, motive, and bias of the testimony of the complainant, just to say that this is one incident where everybody fell off the cloud in this one incident without putting into context that they had this lengthy relationship as a married couple together, I thought that would be wrong."

The trial court further explained:

"THE COURT: "And I did bifurcate what I considered to be relevant and probative, more probative than prejudicial testimony between [the victim] and that of what was proposed to be from [the first wife]. We had conversations about that.

[The victim] was the complainant in this case. They were a married couple. I did not think it would be fair to [defendant] just to put all of this in a vacuum and say that everything that I can consider—and the only thing that the trier of fact could consider was, me or a jury, could be the incidents of that terrible evening in question."

¶ 22     With respect to incidents involving the first wife, the trial court explained:

---

[5]Posttrial counsel later stated that trial "[c]ounsel never addressed that at all. There was no discussion."

"THE COURT: "As to [the first wife], that was a different matter. That is a true proof of other crimes old-fashioned type of analysis that had to be made. I believe I did make that analysis. The propensity argument I found to be forbidding. I found to be problematic. I found to be too overwhelming. I thought to consider arguments about propensity would be unfair to [defendant]. I have issues about using that word in these types of criminal settings and I particularly said that we're not going to talk about propensity. But at the end of the day did I find that [the first wife] was proper to me what she had to contribute, would it be more probative or more prejudicial [?] I found it to be more probative."

The court then explained how it determined that the evidence regarding the first wife was sufficiently reliable to be admissible and how it balanced probative value against possible unfair prejudice:

"THE COURT: "How did I determine it was reliable enough? There were applications where she did go to court and did receive, based on [statements] that she had made I assume—I have to assume under oath, to get orders of protection. I found that *** to be enough of an indicia of reliability. I understand that there were no court convictions *per se*, that that would be a different matter altogether, but I found that it was reliable, that looking at all of this in its totality based on the proffers that I heard, that it would be more probative than prejudicial and I agreed to let it in understanding that that was going to be for a limited purpose. The limited purpose did not include propensity."

¶ 23    Regarding defendant's claim of trial counsel's alleged ineffectiveness, the court found:

"THE COURT: "He probed the witnesses at length. He did not cut any corners. He posited a theory that somehow [the victim] had injured herself, that these were all self-inflicted wounds, that she was trying to frame [defendant]. And he did as good a job as he could under the circumstances."

The trial court specifically found that trial counsel cross-examined well and argued well and that, overall, he was "extremely effective":

"THE COURT: "I thought he was extremely effective and, in fact, on the major charge against defendant [trial counsel] did persuade the trier of fact to acquit [defendant] on that count. That, of course, would be the attempted murder. Also one of the aggravated battery counts because I found the evidence not to be as—at least not beyond a reasonable doubt as to some of the lingering effects of some of the injuries suggested."

The trial court found that, to look back now and suggest ineffectiveness, "I can't see that as even close."

¶ 24        After denying defendant's posttrial motion for acquittal or a new trial, the trial court stated that it would proceed to sentencing. But first, the trial court said that it wanted to see all the lawyers in chambers and told the court reporter to take a 15-minute break.[6]

¶ 25        After the short recess, the government called, in aggravation, both wives who testified about the lasting effects of the abuse they suffered at the hands of defendant. In mitigation, the defense discussed defendant's work as a first responder. After observing that the sentencing range was "three to seven years in the penitentiary or probation with a minimum of 60 days,"

---

[6]We note the off-the-record breaks because the half-sheets indicate that the trial court merged the remaining counts into one, although that does not appear in the court reporter's transcript for the sentencing.

the trial court sentenced defendant to felony probation for three years, with "100 days in the Cook County Jail." After pronouncing sentence, the trial court explained that it "called lawyers in chambers because I wanted to discuss, among other things, the sentencing range." Defense counsel made a motion to stay the order of incarceration for two months, and the court went off the record again with "just the lawyers." Back on the record, the trial court stated that it would stay the mittimus, over the State's objection, and that defendant did not have to report until August 2, 2022.

¶ 26        A handwritten note, signed by the trial judge and entered on the "Criminal Disposition Sheet" for July 26, 2022, memorialized both the sentence and the stay of the mittimus. It also stated: "All counts concurrent, merge into Ct 2." This handwritten note appeared under the heading "Court Order Entered." Another handwritten note, also signed by the trial judge and entered on the disposition sheet for August 2, 2022, stated: "Order of 7/26/22, to stand." [7]

¶ 27        A contemporaneous handwritten entry on the half-sheet for July 26, 2022, stated: "all counts concurrent merge into Ct 2." The entry also noted that defendant's motion for a new trial was denied; that the sentence was 3 years' probation with 100 days in "CJ"; that defendant received a credit of 17 days for time served; and that a stay of the mittimus was ordered until August 2, 2022, over the State's objection. A subsequent handwritten entry for August 2 stated, "order of 7/26/2022 to stand."

¶ 28        However, a typewritten "Order of Commitment and Sentence to Cook County Department of Corrections," dated August 2, 2022, stated that defendant was sentenced on count III, rather than count II. This commitment order stated that defendant's commitment to

---

[7]There is no order in the record before us for July 26, 2022, other than the handwritten note, signed and entered by the judge on the disposition sheet that declares that all counts were merged into count 2.

the Cook County Department of Corrections was for 100 days without any mention of the 3 years of probation.[8] The commitment order further stated: "Bond revoked—mitt to issue."[9] The "Sentencing Order[,] Adult Probation," dated August 2, 2022, indicates the conditions of defendant's probation but does not indicate on what count it was entered.

¶ 29        The "Criminal and Traffic Assessment Order," dated August 2, 2022, details the fines and assessment imposed. Among the amounts imposed was an assessment for domestic violence violations with "$200 for each sentenced violation." Due to the merger of counts, only one $200 amount was imposed on the line for this item.

¶ 30        On August 3, 2022, defendant filed a notice of appeal, and this timely appeal followed. The notice mistakenly stated that defendant's sentencing and the denial of his posttrial motion occurred on August 2, 2022, and that his sentence was only the 100 days spent in jail, without mention of the 3 years of felony probation. However, these errors do not affect the timeliness of the notice.

¶ 31                                    ANALYSIS

¶ 32                                I. Scope of Appeal

¶ 33        Before turning to the claims raised by defendant, we must first address the argument raised by the State concerning the scope of this appeal. The State argues in its brief that the trial court merged counts III and V into count II and sentenced defendant on count II alone. In effect, the State argues that the "3" on the typewritten commitment order was a typo and that,

---

[8]A computerized printout, entitled "Case Summary," has an entry for August 2, 2022, that appears to reflect the commitment order, in that the computerized printout reflects that the sentence was entered solely on count III. However, while the printout indicates findings of guilt on counts II, III, and V, it fails to reflect the merger that is on the handwritten disposition sheet signed by the judge. The printout itself is not signed and does not indicate who entered the information into the computer.

[9]Since the commitment order lacked the full sentence and stated that the mittimus was still to issue, this suggests that the order itself was not intended as the mittimus or full sentencing order.

as a result of the merger, defendant has a right to raise on appeal only claims regarding count II. *People v. Lucious*, 2016 IL App (1st) 141127, ¶ 63 (where the trial court entered a sentence on only one count, claims regarding the other count were "not before us"); *People v. Childress*, 321 Ill. App. 3d 13, 26 (2001) ("There is no final judgment in a criminal case until the imposition of a sentence, and, in the absence of a final judgment, an appeal cannot be entertained."). Defendant responds that we should consider all three counts as viable.[10] Why defendant would want more viable counts against him, rather than less, is baffling. *People v. Boyd*, 2021 IL App (1st) 182584, ¶ 69 ("Whether [a count] was eliminated by vacatur or by merger appears to us to be a difference without a distinction."). For reasons explained below, we find that defendant has a right of appeal only from count II, upon which sentence was entered, and we exercise our discretion to correct the sentencing order to reflect that sentence was entered on count II, that counts III and V were merged into count II, and that the sentence includes 3 years of felony probation.

¶ 34    A "defendant has the right of appeal in all cases from *sentences* entered on conviction" in a felony case. (Emphasis added.) 730 ILCS 5/5-5-4.1 (West 2020). " 'Final judgment in a criminal case is not entered until the imposition of the sentence. The final judgment in a criminal case is the sentence.' " *People v. Erves*, 2020 IL App (1st) 171135, ¶ 6 (quoting *People v. Lopez*, 129 Ill. App. 3d 488, 491 (1984)); *People v. Van Dyke*, 2020 IL App (1st)

---

[10]In his reply brief, defendant responded, "[f]irst, no one has any idea what the trial court's 'handwritten notes on half-sheets' means." As this court has previously explained in prior opinions, " '[a] half-sheet is a sheet on which the clerk's office enters chronological notations indicating the procedural events of a case.' " *People v. Begay*, 2018 IL App (1st) 150446, ¶ 47 (quoting *People v. Jones*, 2015 IL App (1st) 133123, ¶ 8 n.3). This court has previously held that the half-sheet may be relied on as evidence of a legal event. *Begay*, 2018 IL App (1st) 150446, ¶ 47 (citing supporting cases). Second, defendant argues, without any citation to any authority, that since the counts were not dismissed, they are appealable. A party waives a point by failing to argue it. *Lozman v. Putnam*, 379 Ill. App. 3d 807, 826 (2008) (citing numerous cases in support).

191384, ¶ 59 ("The final judgment in this criminal case was the conviction and sentence entered against defendant ***." (Internal quotation marks omitted.)); *Boyd*, 2021 IL App (1st) 182584, ¶ 65 ("a judgment is not a 'conviction' without the imposition of a sentence [citation], nor final until the entry of sentence"); see Ill. S. Ct. R. 605(a) (eff. Sept. 18, 2023) (defendant has the right to appeal "[o]n [j]udgment and [s]entence [a]fter [p]lea of [n]ot [g]uilty").

¶ 35        The record before us leaves no doubt that all remaining counts were merged into one count, and the sentence entered on only one count. Both the contemporaneous handwritten and signed note by the trial judge on the disposition sheet, as well as the contemporaneous handwritten entry on the half-sheet, establish merger. In addition, both the commitment order and the fines and assessment order indicate entry of sentence on only one count. Thus, all the documents before us establish merger into one count.

¶ 36        However, an issue occurs because a "3" appears on the August 2 commitment order, rather than the "2" that appeared on the contemporaneous, signed and handwritten documents entered by the judge on July 26, the actual day of sentencing. The State argues that the "3" on the August 2 commitment order was in error. Defendant does not argue otherwise, and we have to agree. When a conflict appears between a typewritten sentencing order and the court's oral pronouncement, it is the oral pronouncement that controls. *People v. Maxey*, 2015 IL App (1st) 140036, ¶ 46; *People v. Carlisle*, 2015 IL App (1st) 131144, ¶ 87; *People v. Jones*, 376 Ill. App. 3d 372, 395 (2007); see *In re Mar. S.*, 2023 IL App (1st) 231349, ¶ 37 ("To the extent that the court's oral pronouncement conflicts with the written order, the oral pronouncement prevails."). In the case at bar, the handwritten, signed and contemporaneous notes of the trial judge clearly document the oral sentence that he entered that same day, while the number "3" typed days later on the commitment order appears to be a typo. Thus, we exercise our discretion

17

to "order the clerk of the circuit court to make the necessary corrections" to reflect that counts III and V were merged into count II. *Jones*, 376 Ill. App. 3d at 395; see *Lucious*, 2016 IL App (1st) 141127, ¶ 62 (we found that the trial court "implicitly" merged one count into the other count, where the trial court orally entered only one sentence). Remandment is unnecessary since this court has the authority to directly order the clerk of the circuit court to make any necessary corrections to redress a scrivener's error. *Jones*, 376 Ill. App. 3d at 395; see *Maxey*, 2015 IL App (1st) 140036, ¶ 46 ("we order the mittimus corrected"); *Carlisle*, 2015 IL App (1st) 131144, ¶ 89 ("we correct the mittimus").

¶ 37                                    II. Proof of Other Crimes

¶ 38            Defendant claims, first, that the trial court erred in granting the State's motion to admit proof of other crimes. Prior to trial, both sides moved to admit evidence of other bad acts: the State sought to admit acts by defendant, while defendant sought to admit acts by the victim. For both motions, the trial court permitted evidence of prior acts that occurred between defendant and the victim. This evidence was admitted for the purpose of showing "context" and showing the shared prior history of husband and wife, who both testified. Specifically, the trial court ruled that it would permit this evidence "to put everything in context, I don't have a problem with either side talking about those incidents. I think that's fair. It goes to interest, motive and bias. It is exactly what you are supposed to consider when you consider the believability of witnesses." Regarding the State's motion to admit acts that occurred between defendant and his first wife, the trial court denied the State's motion, in so far as the State sought to admit this evidence to show defendant's propensity to commit domestic violence. But the court did admit it for the limited purpose of showing absence of mistake and a disproportionate reaction.

18

¶ 39       Typically, the admission of other-crimes evidence is governed by Illinois Rule of Evidence 404(b) (eff. Jan. 1, 2011) which provides, in relevant part, that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith except as provided by" certain statutory sections, such as section 115-7.4 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-7.4 (West 2020)). Rule 404(b) further provides that "[s]uch evidence may also be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Ill. R. Evid. 404(b) (eff. Jan. 1, 2011). As referenced by Rule 404(b), our state has a specific statutory section governing the admission of other-crimes evidence in domestic violence cases. Section 115-7.4(a) of the Code provides that, "[i]n a criminal prosecution in which the defendant is accused of an offense of domestic violence *** evidence of the defendant's commission of another offense or offenses of domestic evidence is admissible, and may be considered for its bearing on any matter to which it is relevant." 725 ILCS 5/115-7.4(a) (West 2020); see 725 ILCS 5/115-20 (West 2020). Our supreme court has found that the admissibility of other-crimes evidence pursuant to section 115-7.4 is "within the sound discretion of the trial court, and its decision on the matter will not be disturbed absent a clear abuse of that discretion." *People v. Dabbs*, 239 Ill. 2d 277, 284 (2010).

¶ 40       On appeal, defendant argues that the trial court abused its discretion by "granting the state's motion to admit proof of other crimes without conducting the proper balancing inquiry" regarding prejudice and probative value. In *Dabbs*, our supreme court found that Illinois Rule of Evidence 403 (eff. Jan. 1, 2011) applies to section 115-7.4, as it applies generally to all forms of evidence. *Dabbs*, 239 Ill. 2d at 290. Rule 403 provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair

prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Ill. R. Evid. 403 (eff. Jan. 1, 2011). In addition, section 115-7.4(b) provides, that in weighing probative value against undue prejudice, a court "may" consider the proximity in time to the charged offense, the degree of factual similarity "or" any "other relevant facts and circumstances." 725 ILCS 5/115-7.4(b) (West 2020); 725 ILCS 5/115-20 (West 2020) (in weighing the admission of a prior domestic battery conviction or violation of a protective order, a court "may" consider the same factors). The word "may" ordinarily connotes discretion. *Lichter v. Carroll*, 2023 IL 128468, ¶ 22; *Krautsack v. Anderson*, 223 Ill. 2d 541, 554 (2006).

¶ 41        Citing *Dabbs*, defendant argues that the trial court was required to *sua sponte* consider Rule 403 and determine whether the evidence had to be excluded on the ground that its unfair prejudice outweighed its probative value. Defendant argues that reversal is required because the trial court "did not mention the word probative, 403, or weigh the pros and cons." Further, defendant argues that, "[i]n this case, this Court need not (and should not) get into the balancing inquiry itself—it should be sent back to the trial court."

¶ 42        At the posttrial hearing, defendant's posttrial counsel conceded that trial counsel did not raise this issue during trial. Posttrial counsel stated: "The trial court made no specific rulings on relevancy or prejudice, but trial counsel requested no—there were no requests for findings. Trial counsel never responded in writing to the State's 16-page motion *in limine*." Posttrial counsel further stated that trial "[c]ounsel never addressed that at all. There was no discussion."

¶ 43        As with any evidentiary issue, it must be preserved for our review or it is forfeited. In order to preserve an alleged error for appellate review, a defendant must raise the alleged error

both at trial and in a posttrial motion, or else the alleged error is forfeited. *People v. Piatkowski*, 225 Ill. 2d 551, 564 (2007). "This principle encourages a defendant to raise issues before the trial court, thereby allowing the court to correct its errors \*\*\* and consequently precluding a defendant from obtaining a reversal through inaction." *Piatkowski*, 225 Ill. 2d at 564.

¶ 44        Despite posttrial counsel's apparent concession at the posttrial hearing of forfeiture by trial counsel, defendant argues in his appellate brief to us that "[t]rial counsel vigorously opposed the motion to admit the evidence." At the pretrial hearing, regarding incidents involving the victim, who was defendant's then current wife, trial counsel acknowledged: "as to the relationship where they are asking about the wife to testify, we understand that." In response, the court emphasized: "I am going to give both sides latitude about the relationship between the parties." However, regarding the incidents involving defendant's first wife, trial counsel argued against their admission on the grounds that most of the events were unreported to the police, that the evidence was six or seven years old, that the State wanted to admit it to show propensity, and that the incidents involving the first wife were distinguishable because they occurred during the heat of a divorce proceeding. The trial court addressed the issues raised by counsel, but as posttrial counsel conceded at the subsequent posttrial hearing, trial counsel did not argue unfair prejudice or mention Rule 403.

¶ 45        In the context of admitting evidence, the phrase "unfair prejudice" means something specific. It means that the evidence in question will somehow cast a negative light upon a defendant for reasons that have nothing to do with the case on trial. *People v. Prather*, 2012 IL App (2d) 111104, ¶ 24; *People v. Lynn*, 388 Ill. App. 3d 272, 278 (2009). In other words, it means that the fact finder—usually, the jury—would be deciding the case on an improper basis, such as sympathy, hatred, contempt, or horror. *Prather*, 2012 IL App (2d 111104, ¶ 24; *People*

*v. Lewis*, 165 Ill. 2d 305, 329 (1995). This was not an argument that trial counsel made to the court, who was also the fact finder.

¶ 46　　Despite forfeiture, a defendant may still seek appellate review by putting forth an argument under the plain error doctrine. *Piatkowski*, 225 Ill. 2d at 564-65. Under the plain error doctrine, the burden is on the defendant to show, first, that there was a clear and obvious error and that either (1) that clear or obvious error alone threatened to tip the scales of justice against the defendant because the evidence was so closely balanced or (2) that clear or obvious error affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *Piatkowski*, 225 Ill. 2d at 565.

¶ 47　　However, in the case at bar, defendant did not make any argument under the plain error doctrine in its reply brief, although the State argued forfeiture in its appellate brief, and defendant had the burden under the plain error doctrine. Thus, this issue has been forfeited for our review, twice over.

¶ 48　　Even if we were to consider defendant's argument, we would not find it persuasive. To argue error, defendant relies primarily on *People v. Ellis*, 2021 IL App (2d) 190068-U. This case is far from dispositive. First, while a Rule 23 order such as *Ellis* may be found persuasive, it is not precedential. Ill. S. Ct. R. 23(e)(1) (eff. Feb. 1, 2023) (a Rule 23 order entered on or after January 1, 2021, is not precedential but may be found persuasive). Third, in *Ellis*, the trial court ignored its own finding. In *Ellis*, in response to pretrial argument on the motion, the trial court found that the acts described in the proposed evidence were, in fact, dissimilar to the acts alleged in the offense at issue, but the trial court admitted the evidence anyway. *Ellis*, 2021 IL App (2d) 190068-U, ¶ 7. In contrast to *Ellis*, the trial court in the case at bar made no specific

finding regarding similarity or dissimilarity, because it was not asked to do so.[11] Lastly, the error at the bench trial in *Ellis* was preserved, thereby placing the burden on the State, and the reviewing court still found it harmless. *Ellis*, 2021 IL App (2d) 190068-U, ¶ 26. In stark contrast, the error here was not preserved, and defendant has made no argument for plain error. In sum, *Ellis* is not "instructive," as defendant argues.

¶ 49　　　　For the foregoing reasons, we find that defendant's other-crimes claim was forfeited twice-over and is not persuasive.

¶ 50　　　　　　　　　　　　　III. Ineffectiveness Claim

¶ 51　　　　On appeal, defendant claims that his trial counsel was ineffective. When the trial court denied defendant's posttrial motion on this ground, the trial court found that this claim was not "even close," and we have to agree. Trial counsel convinced the trial court to acquit mid-trial on the most serious count, namely, the attempted murder charge; and to acquit at the end of trial on one of the battery counts—*and* to forbid the State from admitting other crimes-evidence for propensity despite a statutory section generally admitting prior domestic-violence crimes for any relevant purpose.

¶ 52　　　　To determine whether a defendant was denied his right to effective assistance of counsel, we apply the familiar two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Colon*, 225 Ill. 2d 125, 135 (2007) (citing *People v. Albanese*, 104 Ill. 2d 504 (1984) (adopting the *Strickland* test)). Under the first prong of the *Strickland* test, the defendant must prove that his counsel's performance fell below an objective standard of reasonableness "under prevailing professional norms." *Colon*, 225 Ill. 2d at 135. Under the

---

[11]This may have been the result of trial strategy since, as we discussed above, trial counsel was seeking to admit evidence of prior bad acts by the victim.

second prong, the defendant must show that, "but for" counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different. (Internal quotation marks omitted.) *Colon*, 225 Ill. 2d at 135. To prevail, the defendant must satisfy both prongs of the *Strickland* test. *Colon*, 225 Ill. 2d at 135. Thus, if a defendant cannot satisfy one prong, a court does not need to consider the remaining prong. *People v. Graham*, 206 Ill. 2d 465, 476 (2003).

¶ 53        "In order to satisfy the deficient-performance prong of *Strickland*, a defendant must show that his counsel's performance was so inadequate that counsel was not functioning as the 'counsel' guaranteed by the sixth amendment." *People v. Smith*, 195 Ill. 2d 179, 188 (2000). "Further, in order to establish deficient performance, the defendant must overcome the strong presumption that the challenged action or inaction may have been the product of sound trial strategy." *Smith*, 195 Ill. 2d at 188; *Strickland*, 466 U.S. at 689 ("a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance"). Our supreme court has "made it clear that a reviewing court will be highly deferential to trial counsel on matters of trial strategy." *People v. Perry*, 224 Ill. 2d 312, 344 (2007). As a result, "[m]atters of trial strategy are generally immune from claims of ineffective assistance of counsel." *Smith*, 195 Ill. 2d at 188. Thus, for example, "[t]he decision whether to call particular witnesses is a matter of trial strategy" that will generally not support an ineffectiveness claim. *People v. Patterson*, 217 Ill. 2d 407, 442 (2005).

¶ 54        "Representation is an art ***." *Strickland*, 466 U.S. at 693. The competence of trial counsel is determined, not by isolated events, but by the totality of counsel's conduct. *People v. Lemke*, 349 Ill. App. 3d 391, 398 (2004); *People v. Morris*, 335 Ill. App. 3d 70, 78 (2002); *People v. Mitchell*, 105 Ill. 2d 1, 15 (1984). A defendant is entitled to competent not perfect

representation. *Lemke*, 349 Ill. App. 3d at 398; *Morris*, 335 Ill. App. 3d at 78; *People v. Odle*, 151 Ill. 2d 168, 173 (1992). While an isolated error may support an ineffective assistance claim if it is particularly egregious and prejudicial, "it is difficult to establish ineffective assistance when counsel's overall performance indicates active and capable advocacy." *Harrington v. Richter*, 562 U.S. 86, 111 (2011).

¶ 55 On this appeal, after a successful acquittal on the most serious charge, defendant takes issue with trial counsel's strategy. During closing arguments at trial, the trial court specifically asked counsel for his strategy. The court asked: "are you suggesting to me that the injuries that she had that night are all self-inflicted?" Trial counsel replied: " Yes. The doctor said it was a possibility." At the subsequent posttrial hearing, posttrial counsel argued that, once trial counsel was put on notice that the attending emergency-room physician was going to testify that this was not an accident, the trial counsel then had a duty and obligation to hire a doctor who would opine that this could have been an accident. In response to posttrial counsel's argument, the trial court found:

> "THE COURT: "He posited a theory that somehow [the victim] had injured herself, that these were all self-inflicted wounds, that she was trying to frame [defendant]. And he did as good a job as he could under the circumstances.
>
> It came down at the end of the day to be [a] judgment on [the] credibility of the witnesses[.]"

¶ 56 On appeal, defendant claims, as he did in his posttrial motion, that his trial counsel's performance fell below an objective standard of reasonableness for not retaining and calling at trial a competing medical expert. In effect, defendant argues that his trial counsel was

25

ineffective based on his strategic decision to not have dueling medical experts at trial. For the following reasons, we do not find this claim persuasive.

¶ 57    First, the decision whether or not to call a particular witness is a matter of strategy that usually does not serve as a basis for an ineffective assistance claim. *Patterson*, 217 Ill. 2d at 442. Second, the victim's own treating physician conceded that both an accident and a self-inflicted wound were possible. With respect to a self-inflicted wound, he testified: "I don't think the wounds were consistent with self-mutilation, but could she have inflicted them upon herself, yes." Third, we cannot find unreasonable his counsel's strategic decision, particularly in a bench trial, to work with the testimony of the treating physician rather than engage a "hired gun." *Cf. People v. Parker*, 113 Ill. App. 3d 321, 327 (1983) (State's reference to defense's medical expert as "hired gun" was not improper); *Moore v. Centreville Township Hospital*, 246 Ill. App. 3d 579, 595 (1993) (referring to medical expert witnesses as " 'high-priced' " experts and " 'hired-gun doctors' " was not improper), *rev'd on other grounds*, 158 Ill. 2d 543 (1994). Fourth, we reviewed his counsel's overall performance, as we are required to do. At the posttrial hearing, the trial court, who was also the trier of fact, disclosed that, "in fact, on the major charge against defendant [trial counsel] did persuade the trier of fact to acquit." Rarely in a criminal trial does an appellate court get to know why a trier of fact acquitted, but in the case at bar, the finder of fact told us that he was persuaded by counsel. Trial counsel also obtained an acquittal on another count. In addition to these two significant acquittals, the trial court agreed at the pretrial hearing to limit the purpose to which the State's other-crimes evidence could be put. At the end of the day, the trial court found that, overall, trial counsel's performance was "extremely effective," and on this record, we must agree. Thus, we do not find defendant's ineffectiveness claim persuasive.

¶ 58                                    IV. Insufficiency Claim

¶ 59            Finally, defendant claims that the State failed to prove defendant guilty beyond a reasonable doubt. When a criminal conviction is challenged based on the sufficiency of the evidence, a reviewing court must consider all the evidence in the light most favorable to the prosecution and then determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Brown*, 2013 IL 114196, ¶ 48. On appeal, a reviewing court must not substitute its own judgment for that of the trier fact when considering "the weight of the evidence or the credibility of the witnesses." *Brown*, 2013 IL 114196, ¶ 48.

¶ 60            With respect to count II, the count on which he was sentenced, defendant argues that the State failed to prove great bodily harm. In count II, the State charged that, on February 21, 2021, defendant committed the offense of aggravated domestic battery in that "he, intentionally or knowingly caused great bodily injury to [the victim], to wit: [defendant struck [the victim] about the head, and [the victim] was a family or household member, to wit: defendant and [the victim] are married." The State charged a violation of section 12-3.3 of the Criminal Code of 2012 (720 ILCS 5/12-3.3 (West 2020)), which provides that a person commits aggravated domestic battery when he or she commits a domestic battery and, in so doing, "knowingly causes great bodily harm, or permanent disability or disfigurement." In count II, the State charged great bodily harm, rather than permanent disability or disfigurement.

¶ 61            Both parties point us to our supreme court's decision in *People v. Mays*, 91 Ill. 2d 251, 256 (1982), where the court defined simple bodily harm as "some sort of physical pain or damage to the body, like lacerations, bruises or abrasions, whether temporary or permanent." Since *Mays*, appellate courts have "repeatedly articulated the proposition" that great bodily

harm must be more serious or grave than the lacerations, bruises or abrasions that would constitute simple bodily harm. *In re J.A.*, 336 Ill. App. 3d 814, 817 (2003) (finding no great bodily harm where the victim described the injury as feeling like somebody pinched him). Whether a victim's injuries rise to the level of great bodily harm is generally a question of fact for the trier of fact. *People v. Cisneros*, 2013 IL App (3d) 110851, ¶ 12-13 (after viewing photos of five lacerations, the appellate court found that a rational trier of fact could have found that the victim suffered great bodily harm). A finding of great bodily harm does not require either hospitalization of the victim or permanency of a disability or disfigurement. *People v. Figures*, 216 Ill. App. 3d 398, 401 (1991) (the injury qualified as bodily harm, but not great bodily harm, where a shot pierced the victim's shoe but did not penetrate his skin and his foot was treated with iodine at the hospital).

¶ 62 In the case at bar, both parties stipulated that Dr. Chiganos was an expert in the field of emergency room medicine, and the trial accepted him as an expert in this field. The doctor testified that, when the victim was admitted to the hospital, she had head wounds to the side and back of her head. The victim remained at the hospital for four days, being admitted at around 5 a.m. in the morning of February 21, 2022, and released on February 25, 2022. Her discharge diagnosis included a diagnosis of concussion and tinnitus. The doctor explained that tinnitus was "a subjective sensation of ringing in the ears." When asked whether a concussion was a serious medical event, he testified that "[i]t can be." He observed that, in the victim's case, she had both headaches and a ringing in the ears. Also, he testified that she had two independent hematomas, or areas of internal bleeding, to the side and back of her head, as well as two puncture wounds. The doctor testified that, during her hospital stay, the victim developed "ecchymosis or bruising around the ear on the same side, *** to her injury." On

cross, the doctor testified that he was not aware whether the victim returned to the hospital for further treatment after her release, and he opined that tinnitus and headaches may persist or may resolve on their own after time. On redirect, with respect to her discharge diagnosis of concussion, the doctor testified:

"Concussion typically implies some type of persistent cognitive impairment or functional impairment that is sustained after usually blunt trauma to the head where the brain itself translates within the closed structure of the skull. It can lead to a myriad [of] symptoms, like headache, vision loss, nausea, vomiting, dizziness, tinnitus, for example."[12]

¶ 63    The victim testified at trial that, even at the time of trial, she still had "noise in my head, like, just a—it sounds like electrical wires touching." In addition, her balance was affected. About her balance, she testified: "It was very bad for six months. And then it went away for a little bit. And now it has returned, not as bad, but it has returned."

¶ 64    Defendant argues that the victim's injuries were not great because (1) the doctor testified that a concussion "may" be a serious medical event, and the record does not establish that her concussion was a serious medical event; (2) tinnitus is generally self-reported; and (3) there was no testimony that she sought additional treatment for her injuries.

¶ 65    We do not find any of these arguments persuasive. First, a rational trier of fact could find that being struck in the head so hard that it caused multiple hematomas, puncture wounds, a concussion and a four-day hospitalization, qualifies as great bodily injury. *People v. Lopez-Bonilla*, 2011 IL App (2d) 100688, ¶ 18 (evidence was sufficient to establish great bodily harm

---

[12]The word "translate" can mean "to bear, remove, or change from one place, state, form, or appearance to another." Merriam-Webster Online Dictionary, www.merriam-webster.com/dictionary/translate (last visited Dec. 5, 2023) [https://perma.cc/4SRV-MS6P].

where the victim was struck in the head multiple times, including being hit in the head with a blunt instrument); see *People v. O'Dell*, 2023 IL App (5th) 190490-U, ¶ 38 ("bruises, lacerations, and concussion symptoms" are sufficient to show great bodily harm). While hospitalization is not required to establish great bodily injury, the fact that the injury was significant enough to require a four-day stay is a fact we may consider. Second, even if tinnitus is self-reported, the credibility of the self-reporting is generally an issue for the trier of fact not the reviewing court. Third, whether or not the victim sought treatment after her four-day hospital stay does not undercut the fact that she received injuries serious enough that a hospital determined that she needed to remain there for four days. For the foregoing reasons, we do not find these arguments persuasive and find that there was ample evidence to support the trier of fact's finding of great bodily harm.

¶ 66                                      CONCLUSION

¶ 67            For the foregoing reasons, we do not find persuasive defendant's claims regarding the alleged erroneous admission of proof of other crimes, the alleged ineffective assistance of counsel, or the alleged insufficient evidence. Therefore, defendant's conviction is affirmed. However, we correct the sentencing order to reflect that sentence was entered on count II, that counts III and V were merged into count II, and that the sentence includes three years of felony probation.

¶ 68            Affirmed; mittimus corrected.

*People v. Ramirez*, **2023 IL App (1st) 221227**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 21-CR-04031; the Hon. James B. Linn, Judge, presiding. |
| **Attorneys for Appellant:** | Christopher Grohman, of Benesch Friedlander Coplan and Aronoff, Ralph Meczyk, of Ralph E. Meczyk & Associates, and Carly Chocron, of Taft Stettinius & Hollister LLP, all of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Brian A. Levitsky, and Sharon Kim, Assistant State's Attorneys, of counsel), for the People. |